The Shell Law Firm, PLLC
Martin Shell (MS 5689)
11 Broadway, Suite 615
New York, New York 10004
Telephone: (646) 616-3983
Facsimile: (212) 480-8560
Counsel for FXR-ATC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------:

| | |
|---|---|
| FXROBOTT LLC, ARGAND TECHNOLOGIES, CORP. ROBOTT CORP., and ROBERT DEL GRANDE | : <br> : <br> : <br> : |
| Plaintiffs, | : CIVIL ACTION NO. <br> : |
| -against- | : **COMPLAINT** <br> : |
| NOETIQ RESEARCH INC., HENRY WILCOX PIXEL CLOUD TECH SOLUTIONS LLC, PATRICK BLACK, FINNOVATION TECHNOLOGIES LLC, NOAH APPLEBAUM, JOHN DOES, JANE DOES and ABC Corp., | : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants | : <br> : |

---------------------------------------------------------

        FXRobott LLC, Argand Technologies, Corp., Robott Corp., and Robert Del Grande

(collectively "Plaintiffs") for their complaint against Noetiq Research Inc., Henry Wilcox, Pixel

Cloud Tech Solutions LLC, Patrick Black, Finnovation Technologies LLC, Noah Applebaum, John

Doe, Jane Doe and ABC Corp., (collectively the "Defendants") states as follows:

## NATURE OF THE ACTION

        1.    This action arises from Defendants theft of software belonging exclusively to

FXRobott LLC, Argand Technologies, Corp and Robott Corp. (collectively referred to as "FXR-

ATC") that Defendants were paid to develop, as software developers, and Defendants interference

with FXR-ATC's economic advantage, including Defendants efforts to compete against FXR-ATC, with FXR-ATC's work product.

2.      Defendants developed FXR-ATC's software between the Spring of 2023 and February of 2025. In exchange, Defendants received hundreds of thousands of dollars from FXR-ATC. What FXR-ATC did not know until recently via thousands of text messages, exchanged between the Defendants, was that the Defendants were secretly conspiring to steal FXR-ATC's proprietary information including the software Defendants developed for FXR-ATC and repurpose same for their benefit. With FXR-ATC's software Defendants have sought to compete against FXR-ATC through Defendant Noetiq Research Inc. and or an entity known as Hedgerow.

3.      Defendants conspiracy is generally summarized in the following sequence of messages exchanged between the Defendants on or about May 21, 2024.

> An Alternative, if we just walk away, is to trade like $2k as a retail group in our spare time with the same sort of idea, building a PoC over like 6 months, during which we'll be working on the ASE contract, then starting 2025 with a full pitch deck for VCs, IBs, HF, prop traders, and businesses with international exposure.
>
> Going that route, over the same 5 year horizon, we could stand to make much more money while also doing it calmly on our own terms with our fuckheads as majority owners of our IP.
>
> What's your thought process on that? I'm just seeing how they could sue us into oblivion whether we used "their" IP or not if we open a fund of any kind. Obviously you've considered that through so just thinking out
>
> I think that there's enough flexibility in the tech to create something distinct that still contains similar implementations. Our idea is also so new that I think a lot of claims would get covered by vagueness and ambiguity. A HF could very well sue someone for leaking specific algos or strategies, but I don't think they could lay the same claim on "HRL" in general. This thought process follows some discussion I had with the IP attorney regarding what could actually be patented/CR/trade secret. He agreed it is ridiculous to think you can patent math that has been around for half a century and is an active field of research. (emphasis added). See Exhibit D1

4.      Towards the middle of February 2025, after efforts to negotiate a potential ownership interest in Argand Technologies, Corp. failed, Defendants refused to work and stole FXR-ATC's work product, trade secrets and intellectual property. In this regard, Defendants copied this information to other computers or copying data to local memory on non-FXR-ATC's computers. At the same time Defendants celebrated and even boasted that they had "a demo in the morning" utilizing FXR-ATC's property including FXR-ATC's own presentation and deck offering. Defendant Noah Applebaum sent this message to the group on or about February 18, 2025. See Exhibit D2. Rather conveniently for the Defendants, they had recently received FXR-ATC's presentation and deck offering.

5.      FXR-ATC were able to retrieve some of their computer equipment and on or about February 21, 2025, discovered thousands of communications amongst Defendants wherein they admitted to stealing FXR-ATC's work product, trade secrets and intellectual property for their own personal gain.

6.      By this action FXR-ATC seek the immediate return of all work product associated with the software including all source codes, notes, and or memoranda created by the Defendants.

7.      By this action FXR-ATC seek to enjoin the Defendants from utilizing FXR-ATC's software and from competing against the FXR-ATC.

8.      By this action FXR-ATC seek damages due to Defendants egregious conduct.

9.      Pending the outcome of this matter FXR-ATC also seek immediate injunctive relief to protect their trade secrets and confidential information from Defendants misappropriation, to

obtain all of the work product created for FXR-ATC by Defendants, and to stop Defendants from improperly using the stolen information or other company trade secrets.

## PARTIES

10.     FXRobott LLC ("FXR" or "Clovis") is a duly organized and existing Wyoming corporation with its principal place of business located at 26 Hickory Hill, Montvale, New Jersey 07645.  At all times relevant hereto Defendants referred to FXR as Clovis.

11.     Argand Technologies, Corp., ("ATC") is a duly organized and existing Delaware corporation with its principal place of business located at 26 Hickory Hill, Montvale, New Jersey 07645.

12.     Robott Corp., ("RC") is a duly organized and existing Delaware corporation with its principal place of business located at 26 Hickory Hill, Montvale, New Jersey 07645.  RC is the parent company of FXR.

13.     Robert Del Grande ("RDG") is an individual residing in New Jersey and owner of FXRobott LLC, Argand Technologies Corp. and Robott Corp.

14.     Noetiq Research Inc., d/b/a Noetic Research ("NR") is a duly organized and existing Tennessee corporation with its principal place of business located at 1517 Plymouth Drive, Brentwood, Tennessee 37027.

15.     Henry Wilcox ("Wilcox") is an individual residing in New York, Kings County, and owner of NR.

16.     Pixel Cloud Tech Solutions LLC, (PCTS") is a duly organized and existing Tennessee limited liability company with its principal place of business located at 2151 Nectar Lane, Columbia Tennessee 38401.

17.     Patrick Black ("Black") is an individual residing in Tennessee and owner of Pixel Cloud Tech Solutions LLC.

18.     Finnovation Technologies LLC, ("FTL") is a duly organized and existing Tennessee limited liability company with its principal place of business located at 2817 West End Avenue, unit 126-347, Nashville, Tennessee 37203.

19.     Noah Applebaum ("Applebaum") is an individual residing in New York and owner Finnovation Technologies LLC.

20.     John and Jane Doe are fictitious individuals to be identified.

21.     ABC Corp., is a fictitious entity to be identified.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). Plaintiffs and Defendants are citizens of different states, with Plaintiffs domiciled in either Wyoming, Delaware or New Jersey and Defendants domiciled in either Tennessee or New York and the amount in controversy is more than $75,000.00.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391b(2) and (3) because a substantial part of the events or omissions occurred in this district and there is no other district where this action may be brought and Wilcox is subject to personal jurisdiction in this district.

## BACKGROUND

24.    FXR-ATC are technology companies with a focus on the financial industry.

25.    FXR-ATC have invested many thousands of dollars in its technology. FXR-ATC are on the cutting-edge of AI in the financial sector.

26.    To maintain their position as a leader in a competitive industry, FXR-ATC highly value the work ethic of its outside developers and in maintaining strict confidentiality of their proprietary plans, methods, practices, intellectual property, and other confidential information.

27.    FXR-ATC's ability to develop and advance its technology infrastructure is essential to their success.

28.    FXR, as detailed below, engaged/retained the Defendants to develop certain software for FXR's use. FXR assigned all of its rights and interest in the software to ATC, via an assignment.

29.    By their own admissions Defendants, as detailed below, have stolen the software for their own use and development to the determinate of FXR-ATC. Defendants have also refused to surrender all work product to FXR-ATC and have caused FXR-ATC significant damages.

## FACTS
### A. Software Development Agreements and Nondosclosure Agreement

30.    FXR and NR are parties to a certain software development agreement, dated May 15, 2023. A true copy of the agreement is attached hereto as Exhibit A.

31.    FXR engaged NR to act as a Quantitative Research, Quantitative Developer, and Manager of Operations, and NR accepted such engagement, which shall include developing

Software and providing services related thereto as requested by Client and herein (collectively, the "**Services**") on the terms and conditions set forth in this Agreement. Developer shall provide all Software to Client in both object code and Source Code form.

32.     Wilcox as owner of NR was to focus all of his efforts on the Services, but failed to do so.

33.     FXR and PCTS are parties to a certain software development agreement, dated October 1, 2023. A true copy of the agreement is attached hereto as Exhibit B.

34.     FXR engaged PCTS to act as a Full Stack Developer and Manager of Operations, and [PCTS] hereby accepts such engagement, which shall include developing Software and providing services related thereto as requested by Client and herein (collectively, the "Services") on the terms and conditions set forth in this Agreement. Developer shall provide all Software to Client in both object code and Source Code form.

35.     Black as owner of PCTS was to focus all of his efforts on the Services, but failed to do so. Notably Black maintained a full time job as a Developer with HCA Healthcare, and was not shy about sharing details about HCA Healthcare with the other Defendants. Black wrote, :if you wanted to know what working at HCA is like…..". This message was sent on or about April 2, 2024.  See Exhibit D3.

36.     FXR and FTL are parties to a certain software development agreement dated, May 15, 2023. A true copy of the agreement is attached hereto as Exhibit C.

37.     FXR engaged FTL to act as a Quantitative Research, Quantitative Developer, and Manager of Operations, and FTL accepted such engagement, which shall include developing

Software and providing services related thereto as requested by Client and herein (collectively, the "**Services**") on the terms and conditions set forth in this Agreement. Developer shall provide all Software to Client in both object code and Source Code form.

38.     FXR also engaged FTL to act as a stack developer.

39.     Applebaum as owner of FTL was to focus all of his efforts on the Services, but failed to do so.

40.     All of the foregoing software development agreements (collectively referred to as the "SDA") contain similar terms and conditions consisting of the following:

a.     Client is and will be the sole and exclusive owner of all right, title, and interest in and to all Work Product, including all Intellectual Property Rights therein. In furtherance of the foregoing: (a) Developer shall create all Work Product as work made for hire as defined in Section 101 of the Copyright Act of 1976; and (b) to the extent any Work Product or Intellectual Property Right therein does not qualify as, or otherwise fails to be, work made for hire, Developer shall, and hereby does: (i) assign, transfer, and otherwise convey to Client, irrevocably and in perpetuity, throughout the universe, all right, title, and interest in and to such Work Product, including all Intellectual Property Rights therein; and (ii) irrevocably waive any and all claims Developer may now or hereafter have in any jurisdiction to so-called "moral rights" or rights of *droil moral* with respect to the Work Product. See Paragraph 4.1

b.     "Work Product" means all Software, Documentation, Specifications, and other documents, work product, and materials related thereto, that Developer provides to Client

hereunder, together with all ideas, concepts, processes, and methodologies developed in connection therewith, whether or not embodied therein. See Paragraph 1.8

c.    "Intellectual Property Rights" means any and all registered and unregistered rights granted, applied for, or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection, or other intellectual property rights laws, and all similar or equivalent rights or forms of protection, in any part of the world. See Paragraph 1.4

d.    "Software" means the computer program(s), including programming tools, scripts, and routines, Developer develops or otherwise provides under this Agreement, including all updates, upgrades, new versions, new releases, enhancements, improvements, and other modifications made or provided pursuant to maintenance and support services. See Paragraph 1.5

e.    Developer shall have no right or license to, and shall not, use any Client Materials except as set forth in this Agreement. All other rights in and to the Client Materials are expressly reserved by Client. See Paragraph 4.4

41.    FXR paid Defendants for all services they provided.

42.    FXR owns all Work Product, including all Intellectual Property Rights developed by the Defendants.

43.    ATC, by assignment from FXR, owns all Work Product, including all Intellectual Property Rights developed by the Defendants.

44.    Defendants do not dispute FXR-ATC' possessory rights. In fact, during recent negotiations Defendants requested possessory rights to FXR-ATC's work product. Notably, Wilcox stated to the group, "I'm going to have kolton read over our contract and help us rewrite an agreement. The new agreement, I'm thinking for now, should say something like "Noetiq own the IP but we license it to Clovis for a free as long as we're employed there, and Clovis is allowed to license it to other people. "Also we all need more equity and I'm not giving them any other IP contribution until those agreements are finalized". Said communication was sent on or about March 31, 2024. See Exhibit D4.

45.    RC and Defendants Wilcox, Applebaum, and Black are parties to certain Confidential and Nondisclosure agreements to keep FXR-ATC's confidential information private.

46.    As part of each Defendants' duties, Defendants had access to FXR-ATC's proprietary, confidential and trade secret information and historical data including among other things, source code, testing data, software architecture, research and development plans and conceptions, and other intellectual property rights and work product.

47.    The Defendants had an obligation to maintain the foregoing information in strict confidence and not to use it for any purpose other than for FXR-ATC's benefit. More specifically, each defendant agreed not to use the information to compete with FXR-ATC or to help others compete with FXR-ATC.

48.    As developers for FXR-ATC, any and all work product technologies, software code or architecture, intellectual property, schematics, math or other output that were created or derived from their retention belonged and continues to belong exclusively to FXR-ATC.

49.    The Defendants were given a high degree of autonomy by FXR-ATC to perform their research and development work and create valuable intellectual property and or work product for FXR-ATC. Each of the Defendants were entrusted as fiduciary of FXR-ATC, by virtue of the amount of autonomy and resources they were provided, including entrusting them to handle their own work product and encrypted data.

50.    Defendant Henry Wilcox, in particular, as lead developer had a special level of fiduciary trust and responsibility to FXR-ATC.

51.    FXR-ATC provided computer equipment to the Defendants to perform their services. Defendants were not allowed to copy their work product or FXR-ATC's data to any other location other than the computer equipment provided by FXR-ATC.

52.    From the beginning of Defendants retention until their recent abandonment, FXR-ATC continued to provide access to the their data, computer equipment and pay the Defendants their agreed upon rates/fees.

**B. THEFT**

53.    Defendants commenced their work and had success in developing the software FXR-ATC's sought. Defendants often reported to FXR-ATC that they were making progress on the software. All work product produced by the Defendants was maintained solely by the Defendants.

54.    All of the Defendants conspired against FXR-ATC to steal the work product they had developed and confidential information that had been provided by FXR-ATC.

55.    To that end Defendants admitted as follows in the exchanges below:

a. The trading technology will definitely work. From Kolton's cue, I'm ready to start a small private fund/MFO with similar tech and ready put my weight into that. Wilcox sent on or about July 4, 2024. See Exhibit D5.

b. <u>If we're able to leverage what we have in Clovis for hedgerow, will we just keep the fund to use for hedgerow? That depends on what we're able to mutate this company into.</u> It's not going to be an easy separation. Ok Ccool. But we are certainly using MARL [which was developed on Plaintiffs dime] lmao. Wilcox sent on or about July 19, 2024. (emphasis added). See Exhibit D6.

c. I'm not happy about working with him, so I think I'll <u>"Robin Hood"</u> this company moving forward regardless. Wilcox sent on or about October 8, 2024. (emphasis added). See Exhibit D7.

d. Gotcha – we can talk about it soon. Would be good to talk about how I've been working on other "Noetiq IP" for various project. <u>Trying to get clever with pulling threads from our framework into projects without giving away too much with the language used.</u> Both of these things aren't crazy urgent –I'm gonna keep working on other Noetiq projects and will get some technical setup for a retail shop. - - Yes main goal is to ensure that all of your IP remains yours and then the partnership IP with you, Noah and Patrick is separate. Wilcox sent on or about January 24, 2025. (emphasis added). See Exhibit D8.

e. I have a metric fuckload of docs, resources, and code to push/upload, but I'm holding onto most of it until all Agrand's org paperwork is finalized along with our agreements. Kolton is also revising some language to emphasize the creative/property rights of us as contractors, where the IP has strict limitations on its scope and claim. Basically it will say something like "Argand owns this specific implementation but all underlying methologies are Noetiq's or just general knowledge for a specific implantation that we can't copy exactly for someone else….but we will keep the rest in pocket until we give our signatures. Wilcox sent on or about December 13, 2024. See Exhibit D9.

f. Group chat is changed from Brovis to Broetiq (conversations focus from FXR to Noetiq). Sent on or about March 27, 2024. See Exhibit D10.

g. I'm going to have kolton read over our contract and help us rewrite an agreement. The new agreement, I'm thinking for now, should say something like "Noetiq own the IP but we license it to Clovis for a free as long as we're employed there, and Clovis is allowed to license it to other people. "Also we all need more equity and I'm not giving them any other IP contribution until those agreements are finalized. Wilcox sent on or about March 31, 2024. See Exhibit D11.

h. If we can have them accept a more reasonable timeline, work with similar IP on another project, decrease hours spent on Clovis, and get new agreements written up by Kolton that grant us all the things we've been promised. Regarding their

claim to IP, Kolton already put my mind at ease by explaining how flexible that all is. It sounds like we wouldn't even need to change much, though I already know of a hundred things that could be changed and have already reserved ideas for different archs. It's not much of a worry anymore. Basically, if Clovis is an *appealing income stream*, I'll stay. I don't *need to reiterate all the qualifications* in text rn that define our idea of "appealing" – we know these by heart haha. Wilcox sent on or about June 5, 2024. See Exhibit D12.

i.  Been reworking system designs and accompanying documentation. Going to make it available on everyone soon, and thought about your suggestion to put in in the shared Drive so that I'm not the owner. Just had the thought of a potential issue, remembering Kolton's emphasis on contractor IP right v. Argand's ownership. As you can guess where I'm going with this – is…While I know this *label doesn't grant me any special privilege directly, it feels like a "paper trail"* that could help attribute IP origin, should the conflict arise. - I don't think so. You're still the 'creator'…- Okay gotcha, that makes sense, I'm pretty nervous about all this, as I'm sure you've noticed. Don't worry, I understand." Wilcox sent on or about December 15, 2024. See Exhibit D13.

56.    In furtherance of their conspiracy, Defendants disclosed trade secret information/work product belonging to FXR-ATC to third parties, for the purpose of among other things, enticing third parties to work with Defendants and or invest with Defendants company.

57.    In this regard Defendants admitted as follows:

a.  Hey, so a key portion of all of this is the underlying technology that needs to be developed for this has been done with our other company [more like for FXR-ATC]…I have been going to events and casually pitching it and people seem to have interest. Starting tonight, Henry and I are going to more seriously start *pitching it*…." Applebaum sent on or about February 18, 2025. See Exhibit D14.

b.  Founded in 2023 in Nashville, TN and now headquartered in Brooklyn, NY, Noetiq Research pioneers the development of agentic machine learning algorithms – sophisticated systems capable of autonomous decision making and coordination. By integrating applied physics, stochastic control, and multi-agent systems, we address complex challenges across a broad spectrum of industries and verticals, redefining what is possible through intelligent, coordinated autonomy [in other words what FXR-ATC do with the use of FXR-ATC' work product]. Wilcox sent on or about January 21, 2025. See Exhibit D15.

c.  Henry and I are doing a demo for hedgerow tomorrow (lol) and you'll never guess who we're giving it to. A sr product manager at finch. Applebaum sent on or about February 18, 2025. See Exhibit D16.

d. Hey Ayuna? Sorry I missed your call – finishing up a meeting. I look forward to attending your event tomorrow. I will be joining with Noah Applebaum. Wilcox sent on or about February 17, 2025. See Exhibit D17.

e. Hi Ananya! My name is Noah and my ML research company actually just finished our prototype for this exact thing, We call it HedgeRow and we use HMARL (Coined by FXR-ATC) architecture to mitigate risk in multi-nationally leveraged treasury departments. Feel free to shoot me a text. Applebaum sent on or about February 18, 2025. See Exhibit D18.

f. I'm making a fucking great business plan…and I dug up the business cards of some other folks who would probably want to fund this. Wilcox sent on or about March 27, 2024. See Exhibit D19.

g. Looking like our main contract avenues atm will be in Sigint (multi-agent systems coordination (mainly with UAVs, but "non-Kinetic" and pertaining to mainly to signals mapping), and metamaterials (discovery simulation, digital-metas), trading (really asset class is fine but let's choose a couple of niches)… Wilcox sent on or about January 6, 2025. See Exhibit D20.

h. I'm working on this topoMARL paper rn. It's basically the topological stuff I told you about at DSK with two applications: quantum sensor networks (generalizing to all sensor networks) and robot swarms. Hopefully with give us some product to feature and a launching pad for IP strategy [essentially FXR-ATC Work Product]-- It definitely had that capability! It's a very canned and restricted demonstration of Information Space (IS) logic I've been working on in the handbook. Patrick had mentioned how any corporate contract we got, like LM [Lockheed Martin], would want all IP; so, in trying to pull out some threads to make constrained frameworks we could present - - I'm working. Wilcox sent on or about January 25, 2025. See Exhibit D21.

i. "Was just thinking….If Robert doesn't agree to equity redistribution, or really any of our conditions, I'm going to say any further R&D outside of the schedule that I wrote to accompany by contract is going to be Noetiq's proprietary tech and Argand can license it. Like I'll keep my job duties but any new tech/method is Noetiq's. Thinking this should be an ultimatum. If he doesn't accept I'll bounce (and possibly reveal that I can make this project obsolete in a matter of a couple weeks). – Honestly later on when you build a better version of argand, we should make it a customer. Wilcox sent on February 12, 2025. See Exhibit D22.

58. Contemporaneous to the Defendants abandonment, Defendants performed several unauthorized acts to FXR-ATC's significant detriment including but not limited to (1) copying FXR-ATC's confidential and propriety information from FXR-ATC's computer equipment in Defendants possession to other non-FXR-ATC's computer storage media owned or controlled by

Defendants and (2) reformatting FXR-ATC's computer equipment so when the equipment was returned they had either no data or hardly any on them, thereby eliminating the entire value to FXR-ATC of the information contained on the computer equipment.

59.     Simply put, Defendants actions constituted a literal heist of the paid work Defendants did over the course of about two years. Defendants defrauded FXR-ATC out of hundreds of thousands of dollars in monetary payments and stole millions of dollars of FXR-ATC's proprietary data and information that the FXR-ATC devoted substantial resources to develop. At one point Defendants even wrote, "Send them a virus" on or about April 29, 2024. See Exhibit D23.

60.     As a result of these actions, FXR-ATC have been damaged and continue to be damaged while Defendants retain FXR-ATC's confidential and proprietary information, including work product, and fail to return it, to FXR-ATC. Notably, Wilcox in response to Plaintiffs demand to surrender all work product stated on or about February 20, 2025 that, "The only company property I have is the Mac Studio computer and the webcam. Anything I wrote in the notebook was transcribed to company Google Docs. You don't need them and they are not company property". (emphasis added).  See Exhibit D24.

61.     As a result of the foregoing, FXR-ATC has suffered significant damages.  Such damages continue to accumulate. Notably FXR-ATC's sustained significant damages in pursuing its rights that presently exceed $10,000.00 and will suffer irreparable harm if the relief requested herein is not granted.

62.     Every day that Defendants refuse to cooperate FXR-ATC are harmed. Without the requested relief FXR-ATC will be irreparable harmed simply because Defendants have stolen FXR-

ATC's work product that they were paid to develop and have used same for their own benefit while significantly harming FXR-ATC.

**COUNT I**
**(Injunctive and Other Immediate Relief)**

63.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 62 as though set forth fully herein.

64.    The SDA is a valid and binding agreement, which clearly establishes the parties' obligations.

65.    FXR-ATC fulfilled all of their obligations due and owing under the SDA.

66.    FXR-ATC are the rightful owners of property, including software, computer data, trade secret and proprietary information, and work product created by Defendants while they were engaged by FXR-ATC ("FXR-ATC's Work Property").

67.    Defendants have stolen FXR-ATC's Work Property.

68.    Defendants have refused to surrender FXR-ATC's Work Property.

69.    Defendants have sought to utilize FXR-ATC's Work Property for their own gain and to FXR-ATC's determinant.

70.    FXR-ATC are entitled to the immediate return of all of FXR-ATC's Work Property including any proprietary information and trade secrets received by Defendants from FXR-ATC.

71.    FXR-ATC are entitled to injunctive relief both immediately and during the pendency of this action enjoining Defendants from interfering or competing with FXR-ATC's business and from utilizing any work product developed for FXR-ATC.

72.    FXR-ATC will suffer irreparable harm without injunctive relief.

73.    FXR-ATC lack an adequate remedy at law.

74.     Every day that Defendants refuse to cooperate FXR-ATC are harmed. Without the requested relief FXR-ATC will be irreparable harmed simply because Defendants have stolen FXR-ATC's Work Product that they were paid to develop and have used same for their own benefit while significantly harming FXR-ATC.

**COUNT II**
**(Violation of the Defend Trade Secrets Act)**

75.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 74 as though set forth fully herein.

76.     At all relevant times, FXR-ATC possess and or control confidential and trade secret information as well as FXR-ATC's Work Product, including as defined by 18 U.S.C. § 1836 *et seq.* The proprietary business information of FXR-ATC constitutes trade secrets because FXR-ATC derive independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy, including as described above and by maintaining that information in restricted access accounts and computers. FXR-ATC's confidential and proprietary trade secret information described herein is not, and was not, generally known to FXR-ATC's competitors in the industry. The trade secret information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

77.     Defendants have actually misappropriated, and threaten to continue to misappropriate, FXR-ATC's trade secrets without FXR-ATC's consent, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. Defendants have retained copies or originals of FXR-ATC's proprietary and confidential computer data and R&D work product. Defendants have no

other background or platform that would warrant the type of investment they assert they have lined up, other than based on FXR-ATC's proprietary and confidential computer data and trade secrets. Defendants cannot separate out FXR-ATC's trade secrets and confidential information in starting a competing company in the exact technology space that they worked in for FXR-ATC. As a result, injunctive relief pursuant to 18 U.S.C. § 1836(b) is appropriate.

78.     All Defendants plan to work, or are already working, at a competing venture based on FXR-ATC's trade secret and proprietary material and R&D work product.

79.     As a product of their retention/engagement with FXR-ATC, Defendants had access to FXR-ATC's valuable trade secrets and confidential information as described herein. They continue to have knowledge of that information, notwithstanding the fact that they are working for a competitor, namely, NR or Hedgegrow or other entity utilized by Defendants for the express purpose of stealing and using FXR-ATC's proprietary and trade secret information.

80.     Defendants have disclosed, and intend to continue to disclose, FXR-ATC's trade secrets and confidential information to others, including their own entities, in violation of the Defend Trade Secrets Act.

81.     As a proximate result of Defendants' misappropriation and threatened misappropriation of FXR-ATC's trade secrets and confidential information, FXR-ATC have suffered, and will continue to suffer, damages in an amount to be proven at the time of trial, but which are substantial and in excess of the minimum jurisdictional amount of this Court.

82. Defendants have been, and continue to be, unjustly enriched and FXR-ATC are entitled to all recoverable damages in an amount to be proven at the time of trial, but which are in excess of the minimum jurisdictional amount of this Court for this statutory claim.

83. As a further proximate result of Defendants' wrongful conduct and threatened misappropriation, FXR-ATC have been injured, irreparably and otherwise, and is threatened with additional and on-going injuries. Because FXR-ATC's remedy at law is inadequate, FXR-ATC seek temporary, preliminary and permanent injunctive relief. FXR-ATC are threatened with permanently losing technology, its competitive advantage, and its trade secrets in amounts which may not be possible to determine, unless Defendants are enjoined and restrained by order of this Court, as alleged above.

84. Defendants will be unjustly enriched by the threatened misappropriation of FXR-ATC's trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, threaten to disclose, acquire and/or otherwise misappropriate FXR-ATC's trade secrets and confidential information, including but not limited to, FXR-ATC's files and data, as well as the work product created by Defendants while engaged/retained by Plaintiff.

85. FXR-ATC are therefore entitled to damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss, pursuant to 18 U.S.C. § 1836(b)(3)(B).

86. Upon information and belief, Defendants' misappropriation and threatened misappropriation has been willful and malicious in light of the terms of Defendants' engagement/retention and Defendants' acknowledgment of their unlawful acts, but continued

deliberate violation of their obligations nonetheless. Thus, FXR-ATC's trade secrets have been willfully and maliciously misappropriated, and FXR-ATC are entitled to an award of exemplary damages of two times the damages it would otherwise be entitled to, pursuant to 18 U.S.C. § 1836(b)(3)(C).

**COUNT III**
**(Property Theft/Conversion)**

87.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 86 as though set forth fully herein.

88.    FXR-ATC are the rightful owners of FXR-ATC's Work Product.

89.    Defendants, and each of them, interfered with FXR-ATC's Work Property by at least the following:

    a.  Taking possession of FXR-ATC's Work Property;

    b.  Preventing FXR-ATC from having access to FXR-ATC's Work Property;

    c.  Destroying the FXR-ATC's Work Property on FXR-ATC's computers by reformatting them; and

    d.  Refusing to return FXR-ATC's Work Property when demanded by FXR-ATC

90.    The wrongful conduct of each Defendant was a direct cause of harm to FXR-ATC.

91.    As a direct result of these concerted actions, FXR-ATC have suffered monetary, competitive and irreparable harm.

**COUNT IV**
**(Fraud/Deceit)**

92.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 91 as though set forth fully herein.

93.    Defendants, and each of them, defrauded FXR-ATC by having FXR-ATC fund their efforts and give them access to proprietary information on the premise that Defendants would

provide FXR-ATC with work product, when in fact, Defendants planned to, and did abscond with the money, FXR-ATC's confidential, trade secret and proprietary information, and the work product to instead start up a competing venture.

94.    Had FXR-ATC been informed of the truth, FXR-ATC would not have paid Defendants the money or allowed continued access to FXR-ATC's trade secrets or data.

95.    Defendants, and each of them, represented to FXR-ATC that important facts were true, namely that they were working on valuable work product for FXR-ATC's benefit and that FXR-ATC would have access to the work product. Defendants' representations were false.

96.    Defendants, and each of them, for some period of time, knew that the representations were false when they made the representations, or the Defendants made the representation recklessly and without regard for its truth or intentionally misled FXR-ATC into believing the statements remained true when Defendants knew them to be false.

97.    Defendants intended FXR-ATC to rely on the misrepresentation and omissions, and FXR-ATC did justifiably and reasonably rely on Defendants misrepresentations and omissions.

98.    As a result of Defendants' fraud, FXR-ATC were harmed, including that FXR-ATC lost the value of the money it paid to Defendants and lost access to valuable data and work product. FXR-ATC's reliance on Defendants' representations was a substantial factor in causing FXR-ATC harm.

99.    Additionally, based on FXR-ATC's justifiable and reasonable reliance on Defendants' misrepresentations, FXR-ATC continued to pay Defendants and give them access to FXR-ATC confidential and trade secret information and access and use of FXR-ATC's personal property, none of which FXR-ATC would have done but for Defendants' fraudulent misrepresentations.

100.    Additionally, FXR-ATC are being damaged by intentional misrepresentations of Defendants in representing to others that Defendants, rather than FXR-ATC, own FXR-ATC's data and work product.

101.    As a direct result of these concerted actions, FXR-ATC have suffered monetary, competitive and irreparable harm.

**COUNT V**
**(Breach of Contract)**

102.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 101 as though set forth fully herein.

103.    The SDAs are valid and enforceable contracts. The covenants and other provisions contained in the agreements are reasonably necessary to protect legitimate protectable interests in trade secrets, confidential information, customer relationships, work product and goodwill.

104.    FXR-ATC have fully performed all of their obligations under the agreements, including paying Defendants collectively hundreds of thousands of dollars in fees.

105.    Defendants have breached and threaten to continue to breach the agreements in at least the following ways:

    a.    Stealing FXR-ATC's proprietary and confidential information for their own competitive use against FXR-ATC;

    b.    Failing to return FXR-ATC's property, including FXR-ATC's Work Property;

    c.    Competing with FXR-ATC while continuing to receive fees.

106.    Defendants have also breached the SDA by intentionally refusing to work despite continuing to receive fees. In this regard, Defendants have admitted to the following:

    a.    Wilcox wrote on or about July 17, 2024, <u>Let's not let s&r know that we stopped working.</u> Robert asked me to make sure we all continue, and that he would make

sure we're all paid. I'm going to agree-I'd rather not cause that friction. Doesn't mean I'm going back to work! Just saying keep it hushed. When we talk to him later about timeline, we'll tell him about Kevin's projections. (emphasis added). See Exhibit D25.

b. Black wrote on or about July 4, 2024 that. "I'm here for a paycheck. I'm operating under the assumption right now, for my own sanity, that Clovis will fail and at the end I'll have nothing." See Exhibit D26.

107.    Defendants have also breached the SDA by intentionally withholding proprietary information despite continuing to receive fees. In this regard, Defendants have admitted to the following:

a. Wilcox wrote, "I have a metric fuckload of docs, resources, and code to push/upload, but I'm holding onto most of it until all Agrand's org paperwork is finalized along with our agreements" on or about December 13, 2024. See Exhibit D27.

b. A bit earlier Wilcox also wrote on or about July 9, 2024 that, "I don't want to hand over any more IP-flavored content until we have our new contracts". See Exhibit D28.

c. Wilcox wrote, on or about July 10, 2024, "But I also get kinda sick every time I think of putting this stuff in their hands…18 files…should've pushed a long time ago. See Exhibit D29.

d. In fact, Between May 2023 and February 2025, Wilcox only made one upload to the drive for code. Similarly in 2025, Wilcox failed to upload any code into the

drive. Wilcox did not deny these facts. Despite being paid for nearly 21 months

of work, Wilcox made a single upload to the drive.

108.    As a result of any one of these breaches of the SDA, FXR-ATC have been injured

and face irreparable injury. FXR-ATC are threatened with losing technology, its competitive

advantage, and its trade secrets in amounts which may be not be possible to determine, unless

Defendants and each of them is enjoined and restrained by order of this Court.

109.    As a direct result of these concerted actions, FXR-ATC have suffered monetary,

competitive and irreparable harm.

## COUNT VI
### (Breach of the Covenant of Good Faith and Fair Dealing)

110.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 109 as

though set forth fully herein.

111.    Defendants, and each of them, entered into agreements not to keep or share FXR-

ATC's confidential or proprietary information. As in every contract or agreement, these agreements

included an implied covenant of good faith and fair dealing.

112.    FXR-ATC has fully performed all of their obligations under the agreements,

including paying Defendants collectively hundreds of thousands of dollars in fees.

113.    Each Defendants unfairly interfered with FXR-ATC's right to receive the benefit of

the contract, namely the expectation that FXR-ATC would have ongoing access to Defendants'

work product as well as FXR-ATC's own proprietary and confidential data and information,

including access to that data on FXR-ATC's computers, by, on information and belief, copying the

data to other media exclusively controlled by Defendants and destroying and/or denying access to

that information by FXR-ATC.

114.   FXR-ATC have suffered, and continue to suffer, monetary, competitive and irreparable harm as a result of each Defendants' conduct in breach of the implied covenant of good faith and fair dealing.

## COUNT VII
## (Breach of Fiduciary Duty)

115.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 114 as though set forth fully herein

116.   Defendants, and each of them, were given a high degree of autonomy and trust by FXR-ATC in carrying out their services.

117.   Each Defendant had a fiduciary relationship with FXR-ATC whereby each Defendant was duty bound to act with the utmost good faith for the benefit of FXR-ATC. Each Defendant voluntarily accepted this fiduciary relationship with FXR-ATC.

118.   Defendant Henry Wilcox, as lead developer had a particular level of confidence and responsibility as well as a higher level of duty to FXR-ATC.

119.    Defendants, and each of them, breached their fiduciary duties to FXR-ATC by the acts described in this complaint.

120.   FXR-ATC were damaged and such damage was proximately caused by the breach of fiduciary duty by each Defendants.

121.   As a direct result of these concerted actions, FXR-ATC have suffered monetary, competitive and irreparable harm.

**COUNT VIII**
**(Defamation –Libel and Slander per se)**

122.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 121 as though set forth fully herein

123.    Defendants have defamed Robert Del Grande

124.    Defendants in writing stated

    a.  "Yeah. Honestly I just picture him in a gimp suit with leash at Scott's leg". Applebaum sent on or about April 28, 2024. See Exhibit D30.

    b.  "Yeah I'm sure he does agree. He's so fucking spineless". Black sent on or about April 28, 2024. See Exhibit D31.

125.    Black's girlfriend Lauren even engaged in libel as she sent the below on or about July 22, 2024, to which all the Defendants celebrated, "Tell Lauren my compliments to the chef". See Exhibit D32.

    a.  UH OH 🤨 ROBERT DICK 🤏 GRANDE 😩😩 OF CLO- PISS 🤡🤡🤡 CAPITAL 🤑 IS EXPERIENCING 😳😳 A LITTLE MAN♂️🤏🤏🤏SIGMA🤏🤏 ENERGY🫵⬇️ AND HASN'T RUN ME MY FAT 🤑🤑🤑 FUCKING💰💰💰💰 CHECK 🤑‼️🤬 THE FOUNDER 🤡🤡🤡 HAS 😳😳 CUM 🤏♂️😩😩😩😩😩😩😩 OUT 😩😩 WITH SUM FREAKY 🤡🤡🤡🤡FINANCIAL ISSUES 😩😩 AND DELAYS 🥴 DUE TO LACK OF BALLS 🥜🥜🥜🥜 . WILL HE FINALLY CUCK🤏 UP THE CASH 🤑 OR 🤡🤡🤡WILL 😩😩 TOE-BERT HAVE!!🤪 TO GET ON HIS😩 ALREADY🥵 BRUISED 🤡🤡🤡KNEES 😩😩😩😩😩😩😩😩 2 SUCK🤏🤏🤏🤏 SCOTT 🤑 DADDY'S🍆🍆 TEENY🤏🤏🤏🤏 SAC🥜🥜 UNTIL HE BURST🤪🤪🤪🤪🤪 DADDYS CASH💰💰 AGAIN!?🤑🤑

126.    Defendants knew or should have known, that the above statements they made above as to Robert Del Grande were false before they were so published to others.

127.    These defamatory and libelous statements described above were made by the Defendants with malice and/or a reckless disregard for the truth or falsity of such statements.

128.     These defamatory and libelous statements described above were published to third parties.

129.     *Defendants published these false and defamatory statements with knowledge of their falsity and/or with a reckless disregard for the truth or falsity of these statements.*

130.     These statements constitute defamations and/or libel per se because they have injured Robert Del Grande with respect to his trade and business.

131.     These statements constitute defamation and/or libel per se because they falsely impugn the Plaintiff's honesty, *trustworthiness, dependability and professional fitness and abilities.*

132.     These defamatory and libelous statements describe above have had a devastating financial effect on Robert Del Grande and on his business and personal reputation.

133.     By reason of the foregoing, defendants are liable to Robert Del Grande for defamation and libel.

134.     *As a result of said defamation, Robert Del Grande continues to suffer economically and reputational harm.*

135.     As a result of Defendants' conduct, Robert Del Grande is entitled to monetary and punitive damages.

## JURY TRIAL DEMAND

136.     *FXR-ATC hereby demand a trial by jury for all claims to which they are so entitled.*

## PRAYER FOR RELIEF

WHEREFORE, FXRobott LLC, Argand Technologies, Corp. and Robert Del Grande demand judgment as follows:

    A.      On the First Cause Action of the Complaint compelling Defendants to immediately surrender FXR-ATC's Work Property including any proprietary information and trade secrets received by Defendants from FXR-ATC.

    B.      On the First Cause and Second Cause of Action of the Complaint awarding FXR-ATC temporary, preliminary and permanent injunctive relief to prevent Defendants from destroying FXR-ATC's data or information, preventing Defendants from interfering or competing with FXR-ATC's business and from utilizing any work product developed for FXR-ATC and preventing Defendants from improperly using or disclosing FXR-ATC's trade secret or proprietary or confidential information in any way, including in the research, development, design or execution of any software or products;

    C.      On the Third Cause of Action of the Complaint awarding judgment in favor of FXR-ATC and against Defendants in an amount to be determined at trial, but presently estimated to exceed $3,000,000.00, together with interest thereon and the costs and disbursements of this action.

    D.      On the Fourth Cause of Action of the Complaint awarding judgment in favor of FXR-ATC and against Defendants in an amount to be determined at trial, but presently estimated to exceed $3,000,000.00, together with interest thereon and the costs and disbursements of this action.

    E.      On the Fifth Cause of Action of the Complaint awarding judgment in favor of FXR-ATC and against Defendants in an amount to be determined at trial, but presently estimated to exceed $3,000,000.00, together with interest thereon and the costs and disbursements of this action.

    F.      On the Sixth Cause of Action of the Complaint awarding judgment in favor of FXR-ATC and against Defendants, in an amount to be determined at trial, but presently estimated to exceed $3,000,000.00, together with interest thereon and the costs and disbursements of this action.

G.      On the Seventh Cause of Action of the Complaint awarding judgment in favor of FXR-ATC and against Defendants, in an amount to be determined at trial, but presently estimated to exceed $3,000,000.00, together with interest thereon and the costs and disbursements of this action.

H.      On the Eighth Cause of Action of the Complaint awarding judgment in favor of Robert Del Grande and against Defendants, in an amount to be determined at trial, but presently estimated to exceed $75,000.00, together with interest thereon and the costs and disbursements of this action.

I.      On all causes of action, for interest at the statutory rate, taxable costs and disbursements, reasonable attorneys' fees to the extent allowable at law, and for such other and further relief as to the Court may seem just and proper.

Dated: March 17, 2025
      New York, New York

                               /S/ Martin Shell
                               **Martin Shell, Esq.**
                               Attorney for Plaintiffs
                               The Shell Law Firm, PLLC
                               11 Broadway, Suite 615
                               New York, New York 10004