UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

FXROBOTT LLC, et al.,

                      Plaintiffs,

          -v-

NOETIQ RESEARCH INC., et al.,

                  Defendants.

-----------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:__7/8/2025__

25-cv-2264 (LJL)

<u>OPINION AND ORDER</u>

LEWIS J. LIMAN, United States District Judge:

    Plaintiffs FXRobott LLC ("FXRobott"), Argand Technologies Corp. ("Argand"), and Robott Corporation ("Robott," and together with FXRobott and Argand, "Plaintiffs")[1] move for an order preliminarily enjoining Defendants Noetiq Research Inc. ("Noetiq"), Henry Wilcox ("Wilcox"), Pixel Cloud Tech Solutions LLC ("Pixel"), Patrick Black ("Black"), Finnovation Technologies LLC ("Finnovation"), and Noah Applebaum ("Applebaum") (collectively "Defendants")[2] from utilizing any of Plaintiffs' confidential information or "work product" as the term is defined in the Software Development Agreements ("SDAs"). Dkt. No. 41; Tr. at 3:9–17.[3]

    This Opinion and Order sets forth the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

    For the reasons that follow, Plaintiffs' motion for a preliminary injunction is denied.

---

[1] Robert Del Grande ("Del Grande") is also a plaintiff in this case but does not join in the motion for injunctive relief.
[2] The Court refers to Wilcox, Black, and Applebaum as the "Individual Defendants," and Noetiq, Pixel, and Finnovation as the "Corporate Defendants."
[3] References to "Tr." refer to the transcript of the hearing held on June 18, 2025.

## I.  FINDINGS OF FACT

### A.    The Parties Contract to Create a Financial Software Product

Robert Del Grande is an entrepreneur who owns FXRobott, Argand, and Robot Corp.  Tr. at 12:20–23.  FXRobott is an operating entity that manages payroll, subscriptions, and cloud-based services and was the operating company for the financial software business at the heart of this litigation.  *Id.* at 13:3–10.  Argand owns all of the software-based intellectual property for the business.  *Id.* at 13:16–18.  Robot Corp. is a holding company that owns FXRobott.  *Id.* at 13:23–14:1.

Black is a software developer and infrastructure engineer.  *Id.* at 120:4–5.  He is the owner and sole member of Pixel.  *Id.* at 120:10–11.  Applebaum is a software engineer.  *Id.* at 150:16–17.  He is the owner and sole member of Finnovation.  *Id.* at 150:22–24.  Wilcox provides data science and quantitative research and machine learning research consulting.  *Id.* at 166:5–7.  He is the sole owner of Noetiq.  *Id.* at 166:25–167:3.

Del Grande met Applebaum and Wilcox in April or May 2023.  *Id.* at 14:16–17, 14:22–25.  He met Black in October 2023.  *Id.* at 14:11–12.  Del Grande sought to contract with the Individual Defendants to build an agentic foreign exchange trading system.  *Id.* at 22:8–13, 120:19–23.  Del Grande originated the idea for the system.  *Id.* at 22:24–23:1.  He intended for it to "leverage[e] complex machine learning systems and cutting edge system infrastructure using AI agents to manage FX currency trading."  *Id.* at 24:23–25:2.

On May 8, 2023, Robott Corp. entered into a confidentiality and nondisclosure agreement (an "NDA") with Applebaum.  Pl. Ex. 1C.  Robott Corp. entered into an NDA with Wilcox on May 9, 2023, Pl. Ex. 1A, and entered into an NDA with Black on September 21, 2023, Pl. Ex. 1B.  The substance of the three NDAs is generally the same.  Pl. Exs. 1A–1C.

FXRobott subsequently entered into Software Development Agreements ("SDAs") with Finnovation, Noetiq, Black, and Pixel.  Applebaum signed the SDA on behalf of Finnovation on September 13, 2023.  Pl. Ex. 2B.  Wilcox signed the SDA on behalf of Noetiq on September 20, 2023.  Pl. Ex. 2A.  Black signed the SDA in his individual capacity on September 30, 2023.  Pl. Ex. 2C.  Black signed the SDA on behalf of Pixel on January 5, 2024.  Pl. Ex. 2D.  The substance of the four SDAs is generally the same.  Pl. Exs. 2A–2D.  Black was the only Individual Defendant to enter into an SDA as Del Grande wanted Black to complete a trial period before giving him a full-time offer.  Tr. at 21:5–10.  Black testified that the SDA with Pixel was intended to supersede his individual SDA and that after it was signed, Plaintiffs ceased paying Black under the individual SDA.  *Id.* at 122:19–123:1.

Applebaum and Wilcox began work in May 2023.  *Id.* at 22:14–16.  Black began work a few months later in October 2023.  *Id.*  According to Del Grande, Black worked on the "cloud infrastructure to support the system's theoretical scalability."  *Id.* at 25:6–8.  Applebaum worked on building the user interface.  *Id.* at 25:9–11, 151:23–152:2.  Wilcox managed research and development for the product.  *Id.* at 25:12–15, 168:9–13, 184:14–16, 188:12–189:14.  He developed algorithms for the trading system based on reinforcement learning algorithms that were part of open-source libraries from companies such as Google.  *Id.* at 168:16–169:1, 189:4–8.

The work was intended to be full-time.  *Id.* at 23:24–25.  However, the SDAs did not require Defendants to work full time or contain a timetable for completing the project.  At Del Grande's suggestion, Applebaum quit another job to be able to commit to full-time work.  *Id.* at 24:4–8.  Wilcox too worked only for FXRobott.  *Id.* at 24:13–14.  Black, however, without Del Grande's knowledge, retained another job.  *Id.* at 24:15–18, 123:8–15.

Del Grande hoped that within twelve months of starting, Defendants would produce a functional platform able to take on customers and a "workable, provable model which has the ability to live trade and take on customers to manage funds and use the service." *Id.* at 22:17–23. However, the schedule kept getting pushed back as Defendants assured Del Grande that they were close to creating a product capable of taking on customers, but needed more time. *Id.* at 23:10–16.

Although the SDAs obligated Plaintiffs to pay Defendants on the 1st and 15th of every month, Pl. Ex. 2A § 3.1; Pl. Ex. 2B § 3.1; Pl. Ex. 2D § 3.1, Defendants were often paid weeks late. Pl. Exs. 17A–17C.[4] Del Grande testified that no Defendant had ever been paid more than 30 days late. Tr. at 66:22–67:5. However, the payment records indicate that Pixel and Noetiq did not receive the payment for the July 1, 2024 pay cycle until August 1, 2024—31 days later. Pl. Exs. 17A, 17C; *see also* Tr. at 144:1–22 (testimony of Black). Del Grande testified that that the delay in July occurred because his partner, Scott Hunter ("Hunter"), had the obligation to pay Defendants and told Del Grande he would be unable to do so. Tr. at 68:1–7. Del Grande's text messages with Hunter show that on July 15, 2024, Del Grande texted:

> Hey Scott, I was relying on you to get the guys paid out today for both July 1, and July 15th payroll. As you know, my money is tied up in Amazon. If for whatever reason you can't pay the guys on Clovis[5], please tell me as I need to let them know and I need to figure out a solution. Thanks.

D. Ex. 9. There was no response from Hunter. *Id.* The next day, Del Grande texted:

> Hey Scott, I hope your health is OK. I have not heard from you for some time and I'm beginning to worry. Please let me know about the text above.

---

[4] The payment records also reflect that Defendants were occasionally paid days early. Pl. Exs. 17A–17C.

[5] Del Grande testified that FXRobott does business as Clovis. Tr. at 63:23–24.

*Id.* On July 17, 2024, Del Grande texted Hunter, "I just told Henry to communicate to the team to expect the 2 payroll cycles from you to land Friday or Monday, keeping you in the loop." *Id.* He stated, "I think work will stop if they don't receive it by than [sic]." *Id.* Del Grande sent Hunter a screenshot of an email from Kevin Perdomo ("Perdomo"), a machine learning operations engineer for Argand, in which Perdomo stated that he had not received payment for work completed after June 15, 2024, and that under his contract he should have received payment on July 1 and 15. *Id.*

From the beginning of their working relationship, the parties discussed splitting equity in the company between Plaintiffs and Defendants. Tr. at 69:11–70:17. 140:8–10. 173:1–12, 183:6–8. Those conversations ramped up in August or September 2024 when Hunter exited the company. *Id.* at 70:8–17, 183:9–12. At that point, Defendants threatened to leave unless they were given a greater stake in the company. *Id.* Del Grande was open to the concept of giving Defendants equity and circulated proposed bylaws and governing documents to that effect. *Id.* at 70:20–23, 140:11–15. Plaintiffs returned the documents with comments on or around January 23, 2025. *Id.* at 70:24–71:2. No documents were ever signed reflecting a transfer of equity to the Defendants. *Id.* 140:11–15. The possibility of Defendants investing funds in the company was also raised several times, but no investment was ever made. *Id.* at 146:18–23, 182:24–183:5.

In November 2024, FXRobott assigned its rights in the SDAs to Argand. *Id.* at 24:19–22.

Argand maintained an account on a platform called GitHub, an online repository system that allows coders to store, test, manage, and share their code. *Id.* at 86:10–17, 170:1–3. Defendants would upload the code they wrote to GitHub to facilitate access and coworking. *Id.* at 86:18–87:1. Del Grande contended that Wilcox only made one file upload during his entire 22-month engagement, *id.* at 59:3–11 (testifying the upload was made in July 2024), but Wilcox

testified that he uploaded more than that, either directly or indirectly, *id.* at 207:17–208:15.  Wilcox admitted that he did not upload or push code for the Plaintiffs' project to GitHub as frequently as the other Individual Defendants.  *Id.* at 170:4–9.  He testified that while it is common practice for software developers and engineers such as Black and Applebaum to push code for every minor edit they make, researchers such as Wilcox tend to edit materials more granularly and will wait to complete the overall edit before uploading.  *Id.* at 170:10–20.  Wilcox also testified that Black and Perdomo would occasionally upload or push code on Wilcox's behalf.  *Id.* at 170:24–171:10, 193:11–194:3.  Such an indirect push might occur if Wilcox and the software engineer were working on two components of the same code with Wilcox researching and the engineer actually editing the code.  *Id.* at 171:11–18.  Wilcox also testified that Del Grande asked him and the others in December 2024 not to put anything in GitHub while Del Grande and Hunter navigated Hunter's exit from the company.  *Id.* at 175:19–176:1.  Wilcox accordingly held onto some items he otherwise would have uploaded but ultimately uploaded everything by December 2024.  *Id.* at 175:19–176:13.

Beginning in December 2024, Argand began "paper trading" to test the software Defendants had then developed.  *Id.* at 88:19–89:2.  Paper trading refers to trading in a simulated environment that allows developers to test how their trading strategies would perform in a real market environment without losing (or gaining) actual money.  *Id.* at 88:10–18.  Argand continued paper trading into January 2025.  *Id.* at 89:1–2.  The product paper traded at slightly below breakeven.  *Id.* at 89:3–14.

On January 17, 2025, Wilcox texted Del Grande, "Any update on payroll?"  D. Ex. 57; Tr. at 176:19–22, 177:5–11.  Del Grande responded that he had "[b]een sorting it out my [sic] dad" and that payment would be "going out tomorrow."  D. Ex. 57.  Wilcox testified that later in the

day on January 17, 2025, Del Grande called him and informed Wilcox that an $80,000 charge had arisen in connection with one of Del Grande's other businesses and that because of that charge, Del Grande was "broke" and would be unable to pay the Defendants anymore.  Tr. at 177:12–20.  Wilcox shared that information with Black and Applebaum.  *Id.* at 177:21-23.

In February 2025, the parties were creating a deck to show to potential investors.  *Id.* at 26:1–21, 28:20–29:12.  Defendants provided Del Grande seven graphs for use in the deck.  Pl. Ex. 3.  The graphs demonstrated the performance of Plaintiffs' product against different international benchmarks.  Tr. at 155:12–19.  Del Grande showed those charts and graphs to others including his brother and his brother's roommate.  *Id.* at 156:14–18.

Defendants were not paid in February 2025.  *Id.* at 69:2–3, 91:5–12; Pl. Exs. 17A–17C.  Del Grande testified that he had meetings lined up with potential investors and was waiting to see if the outcome of those meetings would be that the investors would finance the project by paying Defendants in Plaintiffs' stead.  Tr. at 69:8–25.  Argand had an opening bank account balance of $435.33 for the month of February and ended the month $58.61 overdrawn.  D. Ex. 36.  Del Grande confirmed that Argand was approximately $800,000 in debt at the beginning of the month, but he stated that that debt was a function of its financing strategy.  Tr. at 84:6–22.  He testified that although Argand did not itself have sufficient funds to pay Plaintiffs on the contractual pay dates of February 1 or February 15, it could have obtained funds elsewhere, such as from Del Grande's father or from another of Del Grande's companies.  *Id.* at 73:14–74:4, 91:13–95:24, 116:9–10.  However, Del Grande also testified that he "might have" told Defendants on February 18, 2025, that he could not pay them.  *Id.* at 79:1–4.

On February 18, 2025, Del Grande and the Individual Defendants had a lengthy video call in which they discussed Del Grande's dissatisfaction with the software's performance and the

Individual Defendants' dissatisfaction with Del Grande's leadership. D. Ex. 25; Tr. at 126:2–14. Del Grande made several comments on the call indicating that Argand was in debt. D. Ex. 25 at 14:22–26, 49:23–42, 52:03–11, 2:06:39–07:01. Defendants terminated the SDAs later that day. Tr. at 64:13–17, 152:8–15. They stated that they were terminating due to nonpayment. *Id.* at 145:2–6, 152:19–24. Within forty-eight hours of the conversation, Black sent Del Grande notice of the termination. *Id.* at 64:18–22. The other Defendants did not send written notices of the termination, and no Defendant sent a cure letter regarding Plaintiffs' nonpayment. *Id.* at 145:13–15, 164:22–165:2.

Shortly after Defendants were terminated, Del Grande recovered the computer equipment he had provided them. *Id.* at 32:4–11, 101:17–24, 132:2–3, 153:3–10, 179:21–180:9; *see also* 179:23–180:9 (Wilcox testified that he additionally returned notebooks and loose pages containing his handwritten notes). Each Defendant testified that they did not withhold any of the work they completed under the SDAs. *Id.* at 132:4–11, 153:20–154:4, 180:10–14, 190:18–21, 202:24–203:3; *see also id.* at 153:20–24 (Applebaum testified that he centralized the work he had done into one folder on the returned computer to make it easier for Del Grande to find). The Individual Defendants testified that they did not keep any copy of the Plaintiffs' software code or other confidential materials. *Id.* at 132:12–15, 154:5–12, 180:15–18. In February 2024, Del Grande requested that Wilcox walk him through the code that had been uploaded to GitHub, but Wilcox refused, stating that it would take weeks to do so. *Id.* at 204:18–25.

On or around February 20, 2025, Del Grande met with potential investors. *Id.* at 29:13–15, 71:13–17. On February 20, 2025, Del Grande shared some of the communications and work product received from Defendants with Tappollo Media, LLC ("Tappollo Media") to get that company's analysis of the project, whether it would be interested in investing, and what would be

required to restaff the project moving forward.  *Id.* at 74:14–75:1.  Del Grande testified at the hearing that Tappollo Media is primarily owned by Boon Chew ("Chew") and that it has a secondary owner, Frank Perez ("Perez").  *Id.* at 75:2–4.  Del Grande gave Perez access to Argand's GitHub account.  *Id.* at 88:1–3.  Del Grande claimed to have entered into an NDA with Tappollo, *id.* at 75:5–6, but the exhibit offered as evidence of the NDA was stricken from the record.  Dkt. No. 50.

At the present, Plaintiffs have no employees.  *Id.* at 80:10–14.  There is one contractor who is paid by one of Del Grande's other businesses.  *Id.* at 80:15–81:5.  Plaintiffs continue to solicit equity investments but are not selling any products or services at this time.  *Id.* at 81:6–17.  Del Grande has had some further communications with the potential investors, *id.* at 72:14–73:13, but Plaintiffs have not received any offers from investors seeking to acquire equity, *id.* at 89:15–21. Del Grande testified that he has a future meeting set up with at least one investor.  *Id.* at 73:10–13.

Defendants claim that to date, Plaintiffs have not provided full payment for the work Defendants completed under the SDAs.  Black testified that Plaintiffs owe him about $9,000 for completed work.  *Id.* at 133:16–24, 148:16–23.  Applebaum testified that Plaintiffs owe him $8,000–$9,000 for  completed work.  *Id.* at 158:19–25. Wilcox testified that Plaintiffs owe him about $13,000 for completed work.  *Id.* at 182:5–9.

### B.    Defendants' Text Messages Come to Light

Del Grande reviewed the contents of Defendants' returned computers and found approximately 6,000 pages worth of text messages.  *Id.* at 32:19–21; 35:10–12.  Plaintiffs contend that the text messages reveal Defendants withheld work product and misappropriated Plaintiffs' confidential materials and trade secrets.

On July 25, 2023, Wilcox and Applebaum engaged in a text conversation in which they discussed how to "hold on to the fund." Pl. Ex. 5. One stated "[n]ot sure how that would work with equity but maybe the lawyers have some ideas." *Id.*

On or around July 4, 2024, Black sent a text message[6] that stated:

Like I said, it's okay. I'm here for a paycheck. I'm operating under the assumption right now, for my own sanity, that Clovis will fail and at the end I'll have nothing. That way if we do get these doofuses wrangled I'll be pleasantly surprised.

Pl. Ex. 15; Tr. at 142:25–143:5.

On July 9, 2024, Wilcox sent a message that stated:

Have been refactoring agents today bc I wanted to split up specialists and add an RM layer, but I'm also feeling conflicted… bc on one hand, I don't wanna be a blocker to Kevin and we gotta get some shit deployed, but on the other hand I don't want to hand over any more IP-flavored content until we have our new contracts.[7]

Pl. Ex. 13 (ellipses in original).

On July 10, 2024, Wilcox sent a message that stated: "I'm just adding better commenting on stuff now and then I'm ready to push." Pl. Ex. 14. He followed that up with a message stating "18 files … should've pushed a long time ago." *Id.* (ellipses in original). And then another message stating "I guess no one was ready for it anyways but still." *Id.*

In July 2024, Wilcox sent a message that stated:

Let's not let s&r know that we stopped working. Robert asked me to make sure we all continue, and that he would make sure we're all paid. I'm going to agree—I'd rather not cause that friction. Doesn't mean I'm going back to work! Just saying keep it hushed. When we talk to him later about timeline, we'll tell him about Kevin's projections.

---

[6] The parties did not identify the recipient(s) of this or many other text messages introduced as evidence in this case.

[7] The text message included at the end an emoji of a downcast face with a drop of sweat, identifiable as Unicode U+1F613.

Pl. Ex. 16; Tr. at 174:4–7, 198:24–199:2.  Another Defendant responded, "Got it" and then sent a message stating, "Maybe if he put more effort into getting us paid rather than checking in to make sure we're still working, we'd still be working."  Pl. Ex. 16.  Del Grande testified that this exchange likely occurred after he had a conversation with Wilcox around July 13 or 14, 2024 in which he told Wilcox that the Defendants would be paid.  Tr. at 62:21–63:6.  Wilcox testified that he did not actually stop working in July 2024, but conceded Defendants "might have stopped for like a day or two."  *Id.* at 174:18–19, 199:3–15.  He stated that he was working seven-day weeks at that time and may have taken "a little daycation."  *Id.* at 199:24–200:15.

In the fall of 2024, Wilcox texted his younger brother, "I'm not happy about working with him, so I think I'll 'Robin Hood' this company moving forward regardless."  Pl. Ex. 7; Tr. at 175:2–5, 196:2–7.

On December 13, 2024, Wilcox sent a message that stated:

> I have a metric fuckload of docs, resources, and code to push/upload, but I'm holding onto most of it until all Argand's org paperwork is finalized along with our agreements.    Kolton[8] is also revising some language to emphasize the creative/property rights of us as contractors, where the IP has strict limitations on its scope and claim.  Basically it will say something like "Argand owns this specific implementation but all underlying methodologies are Noetiq's or just general knowledge."  So it's like Argand is licensing our knowledge for a specific implantation that we can't copy exactly for someone else.

Pl. Ex. 12; Tr. at 175:15–18, 191:14–15, 192:3–5.  Another Defendant responded asking "Logistics question, are we going to explicitly call out everything Kolton changes or just send them back and say 'we made some modifications.'"  Pl. Ex. 12.  Wilcox replied "Obviously still going to deliver on the things Kevin needs to keep our deadlines, but will keep the rest in pocket until we give our signatures."  *Id.*  The other Defendant responded, "I would also say we should make sure those IP

---

[8] The name "Kolton" is likely intended to refer to Kolton Bell, Defendants' attorney.  Tr. at 41:8–10, 176:4–9.

rights apply retroactively." *Id.* Wilcox testified that all the materials he referred to in that text were produced before the start of this litigation. Tr. at 192:15–193:10

Around February 5 or 6, 2025, Wilcox sent Kolton Bell a message that stated:

Trying to get clever with pulling threads from our framework into projects without giving away too much with the language used. Both of these things aren't crazy urgent—I'm gonna keep working on other Noetiq projects and will get some technical setup for a retail shop[.]

Pl. Ex. 8; Tr. at 41:8–12. Bell responded: "Yeah main goal is to ensure that all of your IP remains yours and then the partnership IP with you, Noah and Patrick is separate." Pl. Ex. 8.

### C.    Defendants Create HedgeRow

Towards the end of their working relationship with Plaintiffs, the Individual Defendants discussed creating a new import/export product they called HedgeRow. *Id.* at 132:23–133:2, 180:25–181:4. Wilcox testified that the concept for HedgeRow differed from Plaintiffs' contemplated product in a few key aspects: (1) it utilized different algorithms, (2) it would not be for placing trades or speculating on the market, and (3) the target clients would be corporations rather than individuals with high net worths. *Id.* at 181:5–12.

Black created a code repository for the project that had the word "HedgeRow" in it and nothing else. *Id.* at 133:3–5. None of the Individual Defendants ever wrote a line of code for HedgeRow or received payment in connection with it. *Id.* at 133:6–9, 154:16–17, 158:4–6, 181:13–14, 181:21–22. All of the Individual Defendants testified that they currently have no plans for HedgeRow or any intention to use code or deliverables created for Plaintiffs. *Id.* at 133:10–15. 158:15–18, 181:23–182:3. HedgeRow does not have any product. *Id.* at 157:1–2.

In February 2025, the Individual Defendants reached out to some of their contacts to discuss HedgeRow and created talking points for use in those discussions. *Id.* at 155:1–5, 163:24–164:1; Pl. Exs. 4A–4B. Defendants represented to at least one of their counterparts that they had

a completed prototype.  "Ananya," a senior product manager at "Finch," sent a message to a group

including Applebaum stating:

> Hi!  Does anyone have a business operating in multiple countries/geographies?
> Would love to hear how you're dealing with treasury management across currencies
> and any tools you can recommend.

Pl. Ex. 10.  Applebaum responded:

> "Hi Ananya!  My name is Noah and my ML research company actually just finished
> our prototype for this exact thing.  We call it HedgeRow and we use HMarl
> architecture to mitigate risk in multi-nationally leveraged treasury departments.

> Just want to state that we are internally referring to it as HedgeRow, you won't find
> anything online yet.  Sorry for any confusion.  Would love to chat about it!

*Id.*  Applebaum testified that HedgeRow did not in fact have a finished prototype and that he was

trying to be a salesman.  Tr. at 156:22–157:12.

Defendants' talking points included some of the charts and graphs Defendants had

previously created for Plaintiffs to use in conversations with potential investors.  *Id.* at 155:9–11,

162:18–163:7, 164:5–17; Pl. Exs. 4A–4B.  Applebaum testified that Defendants included those

charts and graphs as a demonstration of the level of work product they could produce.  *Id.* at

155:20–156:13.  Plaintiffs had not authorized Defendants to use the charts and graphs.  *Id.* at

28:14–15, 165:3–5.  The talking points additionally stated that "[w]e designed a hierarchical multi-

agent RL architecture" and "handed off our first version of it as an algorithmic currency trading

system to a client which allowed us to learn how to operationalize and productize the agents and

in the process we figured out a better way to build it, so we designed that and intend on using it

for hedgerow."  Pl. Ex. 4A.

On February 19, 2025, Defendants met with a senior product manager at a potential

investor to pitch HedgeRow.  Pl. Ex. 9.  Defendants did not provide the potential investors a

demonstration of an actual product or any working code.  Tr. at 156:19–21.

### D.    Relevant Contractual Provisions

The SDAs refer to FXRobott as the "Client," and the defendant counterparty to the contract as the "Developer."  Pl. Exs. 2A–2D.

The SDAs define "Work Product" to mean: "all Software, Documentation, Specifications, and other documents, work product, and materials related thereto, that Developer provides to Client hereunder, together with all ideas, concepts, processes, and methodologies developed in connection therewith, whether or not embodied therein."  Pl. Ex. 2A § 1.8; Pl. Ex. 2B § 1.8; Pl. Ex. 2C § 1.8; Pl. Ex. 2D § 1.8.

Section 4.1 of each SDA states:

> <u>Work Product</u>.  Client is and will be the sole and exclusive owner of all right, title, and interest in and to all Work Product, including all Intellectual Property Rights therein.  In furtherance of the foregoing: (a) Developer shall create all Work Product as work made for hire as defined in Section 101 of the Copyright Act of 1976; and (b) to the extent any Work Product or Intellectual Property Right therein does not qualify as, or otherwise fails to be, work made for  hire, Developer shall, and hereby does: (i) assign, transfer, and otherwise convey to Client, irrevocably and in perpetuity, throughout the universe, all right, title, and interest in and to such Work Product, including all Intellectual Property Rights therein;  and (ii) irrevocably waive any and all claims Developer may now or hereafter have in any jurisdiction to so-called "moral  rights" or rights of *droil moral* with respect to the Work Product.

Pl. Ex. 2A § 4.1; Pl. Ex. 2B § 4.1; Pl. Ex. 2C § 4.1; Pl. Ex. 2D § 4.1.

The SDAs define "Client Materials" to mean:

> [A]ll materials and information, including documents, data, know-how, ideas, methodologies, specifications, software, content, and technology, in any form or media, directly or indirectly provided or made available to Developer by or on behalf of Client in connection with this Agreement, whether or not the same: (a) are owned by Client, a third party, or in the public domain; or (b) qualify for or are protected by any Intellectual Property Rights.

Pl. Ex. 2A § 1.1; Pl. Ex. 2B § 1.1; Pl. Ex. 2C § 1.1; Pl. Ex. 2D § 1.1.

The SDAs define "Third-Party Materials" to mean: "materials and information, in any form or medium, including any software, documents, data, content, specifications, products, equipment,

or components of or relating to the Software that are not proprietary to Developer, specifically excluding any open source software." Pl. Ex. 2A § 1.7; Pl. Ex. 2B § 1.7; Pl. Ex. 2C § 1.7; Pl. Ex. 2D § 1.7.

Each contracting Defendant warranted, among other things, that "all Work Product, excluding Client Materials and Third-Party Materials, is or will be the original creation of Developer." Pl. Ex. 2A § 8; Pl. Ex. 2B § 8; Pl. Ex. 2C § 8; Pl. Ex. 2D § 8. They further stated that "Developer shall, and shall cause its personnel to, take all appropriate action and execute and deliver all documents necessary or reasonably requested by Client to effectuate any of the provisions or purposes of Section 7.1[9] or otherwise, as may be necessary or useful for Client to prosecute, register, perfect, record, or enforce its rights in or to any Work Product or any Intellectual Property Right therein." Pl. Ex. 2A § 4.2; Pl. Ex. 2B § 4.2; Pl. Ex. 2C § 4.2; Pl. Ex. 2D § 4.2.

The SDAs require FXRobott to pay each developer on the 1st and 15th of each month. Pl. Ex. 2A § 3.1; Pl. Ex. 2B § 3.1; Pl. Ex. 2C § 3.1; Pl. Ex. 2D § 3.1.

The SDAs provide three termination mechanisms:

Termination. In addition to any other express termination right set forth elsewhere in this Agreement:

(a) Either Party may terminate this Agreement for convenience, for any reason or no reason, upon 90 days' prior written notice to the other Party.

(b) Either Party may terminate this Agreement, effective on written notice to the other Party, if the other Party breaches this Agreement, and such breach: (i) is incapable of cure; or (ii) being capable of cure, remains uncured 30 days after the non-breaching Party provides the breaching Party with written notice of such breach.

---

[9] Section 7.1 of each SDA provides that "[t]he term of this Agreement commences as of the Effective Date and, unless terminated earlier pursuant to any of the Agreement's express provisions, will continue in effect until 2 years from such date ('Term'), and may be continued thereafter as agreed by the Parties." Pl. Ex. 2A § 7.1; Pl. Ex. 2B § 7.1; Pl. Ex. 2C § 7.1; Pl. Ex. 2D § 7.1.

(c) Either Party may terminate this Agreement, effective immediately upon written notice to the other Party, if the other Party: (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (ii) files or has filed against it a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iii) makes or seeks to make a general assignment for the benefit of its creditors; or (iv) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

Pl. Ex. 2A § 7.2; Pl. Ex. 2B § 7.2; Pl. Ex. 2C § 7.2; Pl. Ex. 2D § 7.2.

The SDAs provide that:

Upon any expiration or termination of this Agreement: (a) the licenses granted hereunder will also terminate except to the extent that any license has an express term that continues for a longer period or is perpetual; (b) Developer shall cease using and delete, destroy, or return all copies of the Client Materials; and (c) each party shall cease using and delete, destroy, or return all copies of the other party's Confidential Information and certify in writing to such party that the Confidential Information has been deleted or destroyed.

Pl. Ex. 2A § 7.3; Pl. Ex. 2B § 7.3; Pl. Ex. 2C § 7.3; Pl. Ex. 2D § 7.3.

Section 10.8 of the SDAs provides that:

Each party acknowledges and agrees that a breach or threatened breach by such party of any of its obligations under 9[10] would cause the other party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other party will be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy.  Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

Pl. Ex. 2A § 10.8; Pl. Ex. 2B § 10.8; Pl. Ex. 2C § 10.8; Pl. Ex. 2D § 10.8.

---

[10] It is not clear what the phrase "obligations under 9" refers to.  Section 9 of each SDA is a provision requiring Developer to indemnify Client in certain situations.  Pl. Ex. 2A § 9; Pl. Ex. 2B § 9; Pl. Ex. 2C § 9; Pl. Ex. 2D § 9.

Each SDA contains a choice-of-law provision stating, "This Agreement is governed by and construed in accordance with the internal laws of the State of Florida." Pl. Ex. 2A § 10.5; Pl. Ex. 2B § 10.5; Pl. Ex. 2C § 10.5; Pl. Ex. 2D § 10.5.

### E.    Procedural History

Plaintiffs, along with Del Grande, initiated this lawsuit by filing a complaint on March 19, 2025. Dkt. No. 4.

On the same date, Plaintiffs and Del Grande filed an application for emergency injunctive relief. Dkt. Nos. 6–8. On March 20, 2025, the Court entered a temporary restraining order temporarily restraining and enjoining Defendants from selling, altering, destroying, or otherwise disposing of, the software Defendants developed for Plaintiffs, including all source codes, notes, and/or memoranda. Dkt. No. 9. On April 1, 2025, the Court held a hearing on the request for a preliminary injunction. Dkt. No. 22; Dkt. No. 45. The Court denied the request without prejudice to a renewed motion for a preliminary injunction. Dkt. No. 45 at 24:4–27:6. In particular, the Court noted that Plaintiffs failed to establish irreparable harm and that significant questions remained with respect to Plaintiffs' likelihood of success on the merits. *Id.*

On April 25, 2025, Defendants answered the complaint. Dkt. No. 27. Defendants filed an amended answer on May 15, 2025. Dkt. No. 35.

On May 2, 2025, Defendants moved to consolidate the hearing on Plaintiffs' renewed motion for a preliminary injunction with the hearing on the merits of Plaintiffs' request for a permanent injunction. Dkt. No. 28. Plaintiffs did not oppose consolidation and the Court granted Defendants' motion for consolidation on May 19, 2025. Dkt. No. 36.

On June 4, 2025, Plaintiffs moved for a preliminary and permanent injunction. Dkt. No. 41. The motion was supported by a memorandum of law and a declaration of Del Grande. *Id.* Defendants filed a memorandum of law in opposition to the motion on June 11, 2025. Dkt. No. 42.

Plaintiffs filed a reply memorandum of law on June 13, 2025.  Dkt. No. 44.  The Court held an evidentiary hearing on June 18, 2025.  Del Grande testified on behalf of Plaintiffs.  The Individual Defendants testified on behalf of Defendants.  The presentation of the evidence concluded the same day.  The parties presented their closing arguments on July 1, 2025.

At the evidentiary hearing, Defendants objected to admission of one of Plaintiffs' exhibits on the grounds that it had not been produced until the morning of the hearing.  Tr. at 76:14–17. The Court reserved on the issue, *id.* at 76:18–22, and received letters from the parties on Defendants' motion to strike, Dkt. Nos. 47, 49.  On June 28, 2025, the Court granted the motion to strike in part.  Dkt. No. 50.  The Court granted the motion with respect to Plaintiffs' motion for a preliminary injunction, but stated that it would permit supplemental discovery into the exhibit with respect to Plaintiffs' request for a permanent injunction.  *Id.* at 5–6.  The result is that this Opinion and Order sets forth only the Court's ruling with respect to Plaintiffs' motion for preliminary injunctive relief, while Plaintiffs' request for a permanent injunction remains open only as concerns that exhibit.  *Id.*

## II.  CONCLUSIONS OF LAW

### A.    Legal Standard

A preliminary injunction is an "extraordinary remedy."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  "Any party seeking a preliminary injunction 'must demonstrate that it will suffer irreparable harm in the absence of the requested relief.'"  *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999)).  In order to justify a preliminary injunction, a movant must demonstrate: (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an

injunction.  *See Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)

(citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### B.    Likelihood of Success on the Merits

Plaintiffs seek injunctive relief based on their causes of action for (1) breach of contract

and (2) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA").  Dkt. No. 41-10

at 4–11; Dkt. No. 44 at 6–10.[11]  Plaintiffs do not show that they are likely to succeed on the merits

of either claim.

### 1.    Defend Trade Secrets Act

A plaintiff claiming violation of the DTSA must prove: "(1) it possessed a trade secret, and

(2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result

of discovery by improper means."  *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions,

Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (quotation omitted).  Defendants argue that Plaintiffs have

failed to demonstrate that they possessed a trade secret.  Dkt. No. 42 at 18–19.  The Court agrees.

---

[11] Although Plaintiffs additionally reference their causes of action for conversion, fraud, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty, Dkt. No. 41-10 at 4, 7, they did not raise any argument with respect to those claims in their briefing or at the evidentiary hearing.  Plaintiffs references to the claims at closing argument come too late.  *See, e.g., United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (declining to consider argument first raised at oral argument).  Even if Plaintiffs' briefs had asserted the claims as bases for the injunctive relief sought, that would not change the outcome as Plaintiffs do not assert that any irreparable harm followed from Defendants' conversion, fraud, breach of the covenant of good faith and fair dealing, or breach of fiduciary duty.  A party seeking injunctive relief may not mix and match its causes of action and its claims of irreparable harm.  The claims for which a plaintiff demonstrates a likelihood of success on the merits must be the ones for which it shows it will incur irreparable harm absent relief.  *See City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 174 (S.D.N.Y. 2010) (holding that state law claims could not support issuance of injunctive relief because "Plaintiff fails to show a threat of irreparable harm with respect to either of its state-law causes of action"), *aff'd in part, appeal dismissed in part*, 406 F. App'x 557 (2d Cir. 2011); *Ayco Co., L.P. v. Feldman*, 2010 WL 4286154, at *8 (N.D.N.Y. Oct. 22, 2010) (noting that a cause of action must be "linked to one of the . . . bases for a finding of irreparable harm" to be "sufficient for this Court to grant preliminary injunctive relief").

For "financial, business, scientific, technical, economic, or engineering information" to constitute a "trade secret," under the DTSA, two conditions must be met: (A) the owner must have "taken reasonable measures to keep such information secret"; and (B) the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(A)–(B); *see Turret Labs USA, Inc. v. CargoSprint, LLC*, 2022 WL 701161, at *1 (2d Cir. Mar. 9, 2022) (summary order).

In addition to those two conditions, there is also a threshold specificity requirement. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th 792, 800 (2d Cir.) ("Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity."), *cert. denied*, 144 S. Ct. 352 (2023). "The specificity requirement places a defendant on notice of the bases for the claim being made against it, and allows a factfinder to determine whether certain information is, in fact, a trade secret." *Id.* at 801 (quotation omitted) (citing Restatement (Third) of Unfair Competition § 39 cmt. d); *accord Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008) ("[S]pecificity is required before the court so that the defendant can defend himself adequately against claims of trade secret misappropriation, and can divine the line between secret and non-secret information, and so that a [factfinder] can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation."). "The existence of a trade secret, including whether it was adequately identified, is 'a fact-specific question to be decided on a case-by-case basis.'" *Syntel Sterling*, 68 F.4th at 800 (quoting *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021)).

Where the purported trade secret at issue takes the form of software, the plaintiff may not merely describe what the software is intended to accomplish; the specificity requirement obligates the plaintiff to explain the actual composition and function of the software. *See Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49–50 (2d Cir. 2018) (holding that where plaintiff's declarants failed to explain "the way in which all of the features [are] interrelated," "the know-how by which" the HD Video Cloud Architecture was created, or "the method of making it work," plaintiff "fails to define the contours of the HD Video Cloud Architecture, [and] a court cannot determine what exactly the HD Video Cloud Architecture encompasses"); *Hayden v. Int'l Bus. Machs. Corp.*, 2025 WL 1697021, at *15 (S.D.N.Y. June 17, 2025) ("Although these documents extol the potential commercial advantages of a real-time analytical tool that can be applied to centralized data, they fail to explain how exactly the various operations, formulas, and concepts combine to form plaintiff's trade secret. This is insufficient for the specificity requirement, which requires the plaintiff to define *with specificity* the parameters of his alleged trade secret and how the elements fit together in a unique and advantageous way.").

Plaintiffs fail to identify a trade secret with sufficient specificity. In their briefing in support of injunctive relief, Plaintiffs claim that "Plaintiffs' trade secrets consist of the Work Product produced under the SDA." Dkt. No. 44 at 9; *see also* Dkt. No. 41-10 at 5 (Plaintiffs argue that "[n]ot only does Plaintiffs own all Work Product, but such material belongs solely to Plaintiffs and constitutes Trade Secrets"). Plaintiffs confirmed in their closing argument that they were claiming trade secret protection over the Work Product in its entirety. Closing Arg. Tr. at 40:10–24.[12] In other words, Plaintiffs define the trade secrets at issue as the "Software, Documentation,

---

[12] References to "Closing Arg. Tr." refer to the transcript of the closing argument held on July 1, 2025.

Specifications, and other documents, work product, and materials related thereto, that [Defendants] provide[] to [Plaintiffs] [under the SDAs], together with all ideas, concepts, processes, and methodologies developed in connection therewith, whether or not embodied therein." Dkt. No. 44 at 9; *see also* Pl. Ex. 2A § 1.8; Pl. Ex. 2B § 1.8; Pl. Ex. 2C § 1.8; Pl. Ex. 2D § 1.8. Del Grande provided the same view at the June 18 hearing. When asked to define the trade secret Plaintiffs are asserting in this case, Del Grande stated that it was "[a]ll of the work product." Tr. at 85:13–14. Even when pressed for specificity, Del Grande maintained that "[e]verything they did would be confidential as it wasn't to be disclosed, so yeah, it would be under a trade secret." Tr. at 85:15–86:9. This definition falls far short of the required specificity.

Plaintiffs' vague reference to an amorphous compilation of information, data, and ideas would not even satisfy the pleading standard for the existence of a trade secret. *See Intrepid Fin. Partners, LLC v. Fernandez*, 2020 WL 7774478, at *2 (S.D.N.Y. Dec. 30, 2020); *Elsevier Inc. v. Dr. Evidence, LLC*, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018). Plaintiffs provide no information as to what information comprises the Work Product or how it functions or fits together. While it may be easy enough to ascertain whether an item was provided by Defendants to Plaintiffs under the SDAs, the inclusion of "all ideas, concepts, processes, and methodologies developed in connection therewith" is impermissibly vague. *See Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590 (2d Cir. 1963) (holding that plaintiff's description of his trade secrets was too "vague and indefinite as not to be entitled to protection under the law of trade secrets"); *PaySys Int'l, Inc. v. Atos Se*, 2016 WL 7116132, at *10 (S.D.N.Y. Dec. 5, 2016) (holding plaintiffs' definition of trade secrets to be overly broad and nonspecific where the plaintiffs stated that "[t]he trade secrets at issue in this litigation are the Products, all Enhancements to the Products and all proprietary information, data, documentation and derivative works related to the Products" (quotation marks

omitted)).  Plaintiffs' failure to identify the trade secrets at issue with sufficient particularity is grounds enough to deny Plaintiffs' requests for injunctive relief.

Even if Plaintiffs had satisfied the specificity requirement, the Work Product that has been discussed in this case would not meet the DTSA's conditions governing what may constitute a trade secrets.  Plaintiffs identified two general categories of Work Product that they claim Defendants misappropriated: (1) the code that comprised Plaintiffs' software and (2) the charts and graphs demonstrating the efficacy of Plaintiffs' software.  The Court reviews each in turn.

### a.    Plaintiffs' Code

Plaintiffs claim that the code that formed the software at issue was Work Product and therefore constituted a protectable trade secret.  Dkt. No. 41-10 at 5; Dkt. No. 44 at 10.  However, Plaintiffs do not show that the code derived independent economic value from its secrecy.  "Under the DTSA, a trade secret must 'derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'"  *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021) (quoting 18 U.S.C. § 1839(3)(B)).  Plaintiffs do not demonstrate that the code had any value, let alone value derived from not being generally known or ascertainable.  Del Grande testified that at the time of termination, he valued the Plaintiffs at about $25 million.  Tr. at 89:22–24.  But Del Grande did not provide any basis for that valuation or indicate what—if any—portion of that value was attributable to the code.  Plaintiffs provided no other evidence supporting that valuation, and the evidence before the Court in fact undermines any inference that the software was valuable. The software developed by Defendants paper traded at a negative, is not being sold, and has attracted no investors.  *Id.* at 81:6–17, 89:3–7, 89:15–21.

23

Although Del Grande testified that he was not discouraged by the paper trading results because the software was in its infancy and "it was only theoretically supposed to be improving and getting better over a longer period of time," *id.* at 114:23–115:17, hope for future value does not substantiate the existence of a trade secret, *see TNS Media Rsch., LLC v. TRA Glob., Inc.*, 977 F. Supp. 2d 281, 315 (S.D.N.Y. 2013) (holding that the plaintiff's "focus" of "build[ing] [a] platform for [one hundred million dollars in] revenues . . . is assuredly a worthy goal" but is not a protectable trade secret). Del Grande's testimony expressing his optimism is also contradicted by his contemporaneous statements on the February 18, 2025 video call. There, he expressed extreme dissatisfaction with the software's progress, stating that the fact that it was backtesting at 4% was "unacceptable" and he was "concerned." D. Ex. 25 at 14:07–09, 16:00–07.[13] Regardless, "information consisting simply of business possibilities or goals is not a trade secret." *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 500 (S.D.N.Y. 2002) (collecting cases). Del Grande's idea for an agentic foreign exchange trading system thus does not constitute a trade secret and Plaintiffs have not shown that the code made any headway in its pursuit of that goal such that it has any independent economic value. Unlike cases in which the trade secret contributed, even if only in small part, to the plaintiff's commercial attractiveness, *see e.g.*, *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 149 (2d Cir. 1996), Plaintiffs have not shown that the secrecy of Plaintiffs' code offers Plaintiffs any commercial advantage.[14]

---

[13] Del Grande made numerous other comments on the call expressing his dissatisfaction with the software's performance. *See id.* at 14:39–45 ("Essentially, not being able to keep my word on what performance is gonna look like on back testing results is certainly concerning."); 16:00–07 ("I'm concerned on the performance of what it looks like right now, I'm concerned, if I said it and sat here and said I'm not concerned, I would be lying, I'm concerned."); 49:23–42 ("It's extremely difficult to wake up in the morning and continue to push when there's nothing left, and sit here positive about a 4% return.").

[14] At closing argument, Plaintiffs' counsel argued that if Plaintiffs' purported trade secrets did not have value, "somebody would have thrown in the towel a long time ago," i.e., if Plaintiffs believed

Whether Plaintiffs took reasonable measures to keep the code secret is also dubious.  "[T]he 'most important consideration' in determining whether information is a trade secret is 'whether the information was secret.'"  *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017) (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986) (Friendly, J.)).  "Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).  Therefore, "where there is no genuine dispute that the party claiming misappropriation disclosed its trade secret to others who are under no obligation to protect the confidentiality of the information its property right is extinguished."  *Town & Country*, 556 F. Supp. 3d at 258 (quotation omitted).  Del Grande confirmed that he shared the Work Product—including Argand's entire GitHub account—with Perez.  Tr. at 74:14–19, 88:1–3.  Although DelGrande testified that he entered into an NDA with Tappollo Media, it is not clear that Perez was bound by that NDA.[15]

### b.    The Charts and Graphs

Plaintiffs also claim a trade secret in the form of the charts and graphs Defendants originally developed for Plaintiffs' use and later repurposed for HedgeRow talking points.  Dkt. No. 41-10 at 5; Dkt. No. 44 at 10.  However, Plaintiffs have taken no pains at all to keep those

---

the code to be worthless, they would not be pursuing injunctive relief and if Defendants believed the same, they would not be fighting an injunction preventing them from using it.  *See also* Dkt. No. 41-1 ¶ 55.  But a plaintiff is not entitled to injunctive relief simply because the defendant objects to the relief sought.  Plaintiffs' requested relief could be read to hamstring Defendants from exploiting any ideas they shared with Defendant even if those ideas were in the public domain or otherwise not protectable.  The injunction thus itself would have economic value to Plaintiffs, in the form of a settlement it could extort, far beyond its value in protecting a trade secret.  Defendants' resistance is not an admission of planned use.

[15] On the motion for preliminary injunctive relief, the Court need not reach the question of whether the stricken NDA binds both Perez and Chew.  The issue remains open with respect to Plaintiffs' request for a permanent injunction.

materials secret.   Del Grande not only showed those charts and graphs to his brother and his brother's roommate, Tr. at 156:14–18, Plaintiffs *filed them on the public docket for this case*, Dkt. Nos. 41–3, 41–4.   Once docketed, those documents became available—and continue to be available—for all of the world to see.   Such intentional public disclosure means that the charts and graphs cannot constitute trade secrets.   *See Locus Techs. v. Honeywell Int'l Inc.*, 632 F. Supp. 3d 341, 350–51 (S.D.N.Y. 2022) ("Plaintiff waived any right to claim trade secret protection when it publicly filed the Order Form containing [its] purported trade secrets."); *UrthTech LLC v. GOJO Indus., Inc.*, 2023 WL 4640995, at *11 n.5 (S.D.N.Y. July 20, 2023) (denying trade secrets claim where the party filed the alleged trade secrets as an exhibit to its first amended complaint); *see also Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 425 (S.D.N.Y. 2021) ("Courts regularly deny trade secret protection if the owner voluntarily discloses the alleged secret.") (collecting cases).[16]

---

[16] At closing argument on July 1, 2025, Plaintiffs' counsel offered to file a motion to seal the documents containing those charts and graphs, which had been public for several weeks by that point.  Closing Arg. Tr. at 40:25–43:9.  On July 3, 2025, Plaintiffs moved to seal the documents. Dkt. No. 51.  On July 4, 2025, Defendants filed a letter in opposition to the motion to seal.  Dkt. No. 52.  The motion to seal is denied.  "[T]here is ample authority for the proposition that where, as here, a party fails to take immediate steps to request that publicly filed materials be sealed, its request to redact or seal may be denied for that reason."  *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, 2019 WL 3034866, at *2 (S.D.N.Y. July 11, 2019) (collecting cases).  "The failure to act promptly plainly belies any such claim of harm."  *Id. at *3.*  Plaintiffs' approximately one-month delay in moving to seal undermines their claims of harm.  *See Rollag v. Cowen Inc.*, 2020 WL 4937462, at *3 (S.D.N.Y. Aug. 24, 2020) (denying sealing based on a delay of three and a half weeks after filing).  Plaintiffs' delay is exacerbated by the fact that Plaintiffs themselves were responsible for filing the charts and graphs on the public docket.  Plaintiffs expressed no concern with the public's access to the documents until after Defendants argued at the evidentiary hearing that such access weakened Plaintiffs' trade secrets claim.  Tr. at 103:20–104:20.  Even now, Plaintiffs offer no argument that their failure to move to seal at an earlier date was inadvertent. *See Byfield v. N.Y.C. Dep't of Educ.*, 2022 WL 3362874, at *2 (S.D.N.Y. July 29, 2022) (denying sealing because "Plaintiff does not explain why she waited many days after she filed her submissions, and after they were made publicly available, to move for those submissions to be sealed").  Plaintiffs also offer no evidence of any harm that would befall them from continued public access to the charts and graphs.  Plaintiffs' belated request to seal is both too little and too

Plaintiffs also fail to demonstrate that the charts and graphs had any economic value associated with not being generally known. The charts and graphs purport to represent how Plaintiffs' software performed and Plaintiffs in fact intended to disseminate them to the wider audience of Plaintiffs' potential investors. Tr. at 26:1–21. Plaintiffs identify no value in the charts and graphs other than the ability to show them to others and thus no value inherent in keeping the charts and graphs secret. *See Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1177 (2d Cir. 1993) (holding that material created to be publicly marketed could not constitute a protectible trade secret), *abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir. 2000) (Sotomayor, J.); *see also Bulldog N.Y. LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 176–77 (D. Conn. 2014) ("To the extent that Bulldog identifies any of its claimed trade secrets in its papers, it is evident that this information was marketed to the defendants, could have been marketed to others, and was intended to eventually be exposed to the public, necessarily resulting in secrecy being lost.").

Because Plaintiffs have not established that they possessed a trade secret, they fail to show a likelihood of success on the merits of their claim for misappropriation in violation of the DTSA. *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 523 (S.D.N.Y. 2017).

### 2.    Breach of Contract

Plaintiffs alternatively seek injunctive relief based on Defendants' alleged breach of the SDAs. Dkt. No. 41-10 at 7–11; Dkt. No. 44 at 6–9. Because the SDAs contain a Florida choice-of-law provision, the Court analyzes Plaintiffs' claim under Florida law. Pl. Ex. 2A § 10.5; Pl. Ex. 2B § 10.5; Pl. Ex. 2C § 10.5; Pl. Ex. 2D § 10.5. Under Florida law, a plaintiff must establish: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting

---

late to support an inference that Plaintiffs took reasonable measures to keep the charts and graphs secret.

from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. Dist. Ct. App. 2008)). A plaintiff must also prove its own performance. *See Jones v. Warmack*, 967 So. 2d 400, 402 (Fla. Dist. Ct. App. 2007) ("If one party to an agreement has breached the agreement, the other party's failure to continue with the agreement is not considered a default of the contract.").

Plaintiffs argue that Defendants breached the SDAs by (1) failing to turn over Work Product; (2) stealing the Work Product for Defendants' unauthorized use; and (3) ceasing work in July 2024 and February 2025. Dkt. No. 41-10 at 7–11; Dkt. No. 44 at 8–9. In response, Defendants argue that (1) the SDAs do not obligate Defendants to turn over the Work Product; (2) Defendants did not use or threaten to use Plaintiffs' Work Product; and (3) Defendants did not inappropriately stop working and properly terminated the SDAs. Dkt. No. 42 at 11–17.

First, Defendants argue that the SDAs define Work Product as materials "that Developer provides to the Client," and thus materials Defendants did not provide were not Work Product within the meaning of the SDAs. *Id.* at 16. But the full definition states that Work Product includes not only the material that is provided to Client but also "all ideas, concepts, processes, and methodologies developed in conjunction therewith, whether or not embodied therein." Pl. Ex. 2A § 1.8; Pl. Ex. 2B § 1.8; Pl. Ex. 2C § 1.8; Pl. Ex. 2D § 1.8. The SDAs state that Developer holds all right, title, and interest in the Work Product. Pl. Ex. 2A § 4.1; Pl. Ex. 2B § 4.1; Pl. Ex. 2C § 4.1; Pl. Ex. 2D § 4.1. And Section 4.2 of the SDAs stated that Developer shall "take all appropriate action and execute and deliver all documents necessary or reasonably requested by Client to . . . prosecute, register, perfect, record, or enforce its rights in or to any Work Product." Pl. Ex. 2A § 4.2; Pl. Ex. 2B § 4.2; Pl. Ex. 2C § 4.2; Pl. Ex. 2D § 4.2. Defendants' argument that

the only material that could be considered Work Product is that which Defendants have provided to Plaintiffs therefore rings hollow.

The much stronger argument for Defendants is that they did turn over all Work Product. Defendants testified repeatedly that they did not create any Work Product to which Plaintiffs lacked access either through GitHub, Google Docs, the returned hardware, or handwritten pages. Tr. at 32:4–11, 101:17–24, 132:2–11, 153:3–10, 153:20–154:4, 179:21–180:14, 202:24–203:3. Plaintiffs did not adduce evidence identifying any Work Product that Defendants withheld. Instead, Plaintiffs primarily relied upon the weak circumstantial evidence of Defendants' texts. Dkt. No. 41-10 at 7. In particular, they point to Wilcox's texts that "I have a metric fuckload of docs, resources, and code to push/upload, but I'm holding onto most of it until all Agrand's org paperwork is finalized along with our agreements," "I don't want to hand over any more IP-flavored content until we have our new contracts," and "I also get kinda sick every time I think of putting this stuff in their hands…18 files…should've pushed a long time ago." *Id.* (quoting Pl. Exs. 12–14). But while those texts indicate that Wilcox may have delayed uploading completed work at various points—including potentially at Del Grande's direction, Tr. at 175:19–176:1—the texts do not show that Wilcox or any other Defendant continued to withhold Work Product after termination. The SDAs do not contain any provision requiring immediate upload or setting any other interim deadlines which Wilcox's delays could have breached. Plaintiffs additionally point to Wilcox's exiguous upload history as evidence that he held materials back. Dkt. No. 41-10 at 7–8. But Wilcox convincingly explained that his role naturally resulted in fewer uploads and that he occasionally authored code that was then uploaded by another. Tr. at 170:4–171:10, 193:11–194:3. Plaintiffs thus fail to demonstrate that Defendants withheld any Work Product in violation of the SDAs.

Second, Defendants argue that they did not use or threaten to use Plaintiffs' Work Product. While it appears true that Defendants did not repurpose any of the code they developed for Plaintiffs to be used by HedgeRow, Tr. at 133:6–15, 154:16–17, 158:4–6, 158:15–18, 181:13–14, 181:21–182:3, it is apparent that the charts and graphs Defendants repurposed for the HedgeRow talking points were Work Product and that charts and graphs provided at least inspiration. Pl. Exs. 4A–4B. The evidence does not demonstrate, however, that Defendants actually divulged the content of the charts and graphs to any third party. Though the charts and graphs appeared in the talking points, there is no evidence that the talking points themselves were shared with anyone other than Defendants or that the charts and graphs were shared in any other capacity. Ultimately, all that Plaintiffs have shown is that Defendants continued to possess and internally reference the charts and graphs after termination. But Plaintiffs do not demonstrate that such internal reference breached any provision of the SDAs.

Third, Plaintiffs argue Defendants stopped or slowed work at two key times: July 2024 and February 2025. Dkt. No. 41-10 at 8–10. Plaintiffs first point to Wilcox' July 2024 texts stating "Let's not let s&r know that we stopped working," as evidence that Defendants ceased performing the contract at that time. Dkt. No. 41-10 at 8 (quoting Pl. Ex. 16). Wilcox admitted at the hearing that he was working seven-day weeks and that he and the other Defendants may have taken a day or two off around that time. Tr. at 174:18–19, 199:3–15, 199:24–200:15. Plaintiffs do not identify any provision in the contract that such a brief work stoppage would breach. The SDAs state merely that Developer shall provide services to Client. Pl. Ex. 2A § 2.1; Pl. Ex. 2B § 2.1; Pl. Ex. 2C § 2.1; Pl. Ex. 2D § 2.1. They do not require that Defendants work a minimum number of hours or days or produce a certain volume of material. Similarly, although Del Grande averred that "Black also

admitted to working less in July of 2024," Pl. Ex. 1 ¶ 31, Plaintiffs do not show that doing so breached Black's or Pixel's contracts.[17]

It is undisputable that in February 2025, however, Defendants entirely stopped performing under the contract in light of their termination of the SDAs.  Plaintiffs claim breach, arguing that Defendants' attempts to terminate did not comply with the SDAs' termination provision.  Dkt. No. 41–10 at 10; Dkt. No. 44 at 8.  The SDAs' termination provisions states that (1) either party can terminate for any reason, upon 90 days' prior written notice; (2) either party can terminate upon written notice of the other party's breach if either (i) the breach is incapable of cure, or (ii) the breach is capable of cure and the breaching party has not cured the breach within 30 days after the non-breaching party provides written notice of such breach; or (3) either party can terminate upon written notice to the other party if the non-terminating party "becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due," among other insolvency-related issues. Pl. Ex. 2A § 7.2; Pl. Ex. 2B § 7.2; Pl. Ex. 2C § 7.2; Pl. Ex. 2D § 7.2.

Defendants argue that they terminated pursuant to the third option.  Dkt. No. 42 at 12–13.[18] Though the contract does not define the term "insolvent," Florida courts have recognized that the

---

[17] Furthermore, even if Defendants' work stoppages or slowdowns breached the contract, such past breaches would support only a claim for contract damages.  They would not give rise to irreparable harms warranting injunctive relief.

[18] Plaintiffs' argument that Defendants' termination should instead be read under the second route—termination upon breach—and thus required Defendants to give Plaintiffs a 30-day cure period, is unavailing.  Though Plaintiffs' failure to pay Defendants may have separately constituted breach of the SDAs' payment provisions, each contracts' specific termination provision for insolvency takes precedence over the more general one pertaining to breach whether by reason of insolvency otherwise.  *See Pottsburg Utils., Inc. v. Daugharty*, 309 So. 2d 199, 201 (Fla. Dist. Ct. App. 1975) ("[W]here both general and specific language are used in a contract, the specific language will govern where there is a conflict."); *accord Estevez v. N. Assur. Co. of Am.*, 428 F. App'x 966, 968 (11th Cir. 2011) (per curiam).  Plaintiffs' alternative argument that Defendants' termination should instead be read under the first route—termination upon convenience—and thus required Defendants to give Plaintiffs 90-days' notice, fails for the same reason.

term may be used in the equitable sense to refer to a situation in which the company's liabilities exceed its assets ("balance sheet insolvency"), or else a situation in which the company is unable to meet its obligations in the ordinary course of business ("equity insolvency"). *See Tomlin v. Anderson*, 413 So. 2d 79, 82 (Fla. Dist. Ct. App. 1982); *Wells Fargo Bank, N.A. v. Palm Beach Mall, LLC*, 177 So. 3d 37, 48 (Fla. Dist. Ct. App. 2015) (applying New York law); *see also* Black's Law Dictionary (12th ed. 2024) (defining "insolvent" as "having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due"). Defendants present evidence that as of February 2025, Argand was insolvent under either metric.

By the time Defendants informed Del Grande of their termination on February 18, 2025, Plaintiffs had missed two payment dates. *See* Pl. Exs. 17A–17C (recording no payments to any Defendant following January 15, 2025); Tr. at 69:2–3, 91:5–12. Defendants provide convincing evidence that Argand was unable to pay at that time due to insolvency: Argand was $800,000 in debt, its bank account was overdrawn, and Del Grande told Defendants that he could not pay them. D. Ex. 36; Tr. at 79:1–4, 84:6–22. It is beyond dispute that Del Grande gave Defendants cause to believe Argand was insolvent. On the parties' February 18, 2025 video call, Del Grande told Defendants that "I'm extremely exposed in this project right now on debt." D. Ex. 25 at 14:22–26. Later in the call, he expressed that "I need a miracle, is what I need, and I need this financing to come through for Argand and stabilize this business." *Id.* at 52:03–11. Del Grande stated that "once Scott left, in September, I really just started pulling against my other entities to keep it alive, because I assume that we were going to be able to service customers quicker." *Id.* at 2:06:39–07:01.

Del Grande testified at the hearing that while Argand did not have cash in its accounts, Plaintiffs overall had access to over $30,000 in credit.  *Id.* at 73:14–74:4, 91:13–21, 116: 3–5; Dkt. No. 45-1 ¶ 44.  He stated that Plaintiffs could have obtained the money from FBA Fund LLC, one of Del Grande's other companies, but admitted that as of the start of February 2025, Argand and FBA Fund LLC did not have any loan agreement in place.  Tr. at 92:14–19.  Del Grande also testified that he could have gotten capital from his father and that his father had loaned him one hundred thousand dollars on a prior occasion.  *Id.* at 116:9–117:11.  However, Del Grande testified that he did not approach his father for financial support in February 2025 because he "would prefer to be independent."  *Id.* at 116:22–117:11.  None of these potential sources of future funds undermine the inference that as of February 2025, Argand's assets exceeded its liabilities or that it was unable to satisfy its obligations as they became due in the normal course of business.  The SDAs thus permitted Defendants to terminate effectively immediately.  Pl. Ex. 2A § 7.2(c); Pl. Ex. 2B § 7.2(c); Pl. Ex. 2C § 7.2(c); Pl. Ex. 2D § 7.2(c).

Defendants additionally argue that the source of Argand's debt blocks their request for injunctive relief.  Closing Arg. Tr. at 9:12–13:7.  They note that much of Argand's capital was borrowed from a series of limited partnerships of which Del Grande is a general partner.  Tr. at 105:20–113:5.  Del Grande signed the loan agreements for both the lenders and the borrower.  *Id.* at 108:3–17.  He was not sure whether the limited partners were informed that the money was being loaned to an entity in which he had an ownership interest.  *Id.* at 111:7–112:13.  Regardless whether this can serve as the basis for a defense of unclean hands, the Court will not consider the argument as Defendants waited until closing argument to raise it.  *See Pascarella*, 84 F.3d at 73; *Nobel Ins. Co. v. City of New York*, 2006 WL 2848121, at *16 (S.D.N.Y. Sept. 29, 2006) (collecting cases stating that courts will not consider arguments raised for the first time at oral argument).

Plaintiffs' only remaining argument that termination was not effectuated properly is that Wilcox and Applebaum failed to give written notice of the termination, as required by the SDA. Dkt. No. 41-10 at 10. Plaintiffs are correct that all three contractual forms of termination require written notice. Pl. Ex. 2A § 7.2; Pl. Ex. 2B § 7.2; Pl. Ex. 2C § 7.2; Pl. Ex. 2D § 7.2. And Defendants do not contest the fact that only Black provided written notice of the termination. Tr. at 64:13–22. However, the rule set out by the Florida Supreme Court in *Patry v. Capps*, 633 So. 2d 9 (Fla. 1994), "requires only substantial and not strict compliance, where notice is required under contracts and statutes." *Megacenter US LLC v. Goodman Doral 88th Ct. LLC*, 273 So. 3d 1078, 1084 (Fla. Dist. Ct. App. 2019). Therefore, "[u]nder Florida law, strict compliance with a notice provision is not required if one of the parties . . . has actual notice." *Id.* (collecting federal and state cases); *accord Sunshine Children's Learning Ctr., LLC v. Waste Connections of Fla., Inc.*, 2023 WL 2809509, at *8 (S.D. Fla. Apr. 6, 2023). Because Plaintiffs had actual notice of the termination on February 18, 2025, Defendants substantially complied with the SDAs' notice requirement for termination. Tr. at 101:7–16.

Ultimately, Plaintiffs fail to demonstrate that Defendants breached the contract and thus do not show a likelihood of success on the merits of their breach-of-contract claim.

## C.    Irreparable Harm

Even if Plaintiffs had established a likelihood of success on the merits of either claim, their request for injunctive relief would fail due to their failure to establish irreparable harm. "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (citation omitted). Courts may not merely find irreparable harm as a categorical matter; plaintiffs must demonstrate actual and imminent harm that cannot be compensated by remedies available at law, such as monetary damages. *See eBay Inc. v.*

34

*MercExchange, L.L.C.*, 547 U.S. 388, 391–93 (2006); *accord Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) (holding that "courts must not simply presume irreparable harm" and that "plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm").

Plaintiffs claim irreparable harm in the form of (1) the dissemination of Plaintiffs' trade secrets; (2) lost good will, reputation, and business opportunities; and (3) the injunctive relief clause in the SDAs.  Dkt. No. 41-10 at 11–14; Dkt. No. 44 at 4–6.  None are availing.

First, Plaintiffs claim that Defendants have stolen and disseminated Plaintiffs' trade secrets in the form of the charts and graphs Defendants incorporated into their HedgeRow talking points. Dkt. No. 41-10 at 12; Dkt. No. 44-5.  They argue that "the dissemination of trade secrets constitutes 'use' of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent." Dkt. No. 41-10 at 12 (quoting *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp.3d 224, 242 (E.D.N.Y. 2024)).

For the purpose of evaluating irreparable harm, there is a key difference between use and dissemination.  In *Faiveley Transp. Malmo AB v. Wabtec Corp.*, the Second Circuit noted that irreparable harm may arise "in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets," however, "[w]here a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, . . . an award of damages will often provide a complete remedy for such an injury.  559 F.3d 110, 118–19 (2d Cir. 2009).  "Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge."  *Id.*  Thus, a plaintiff may not

claim irreparable harm upon a showing that the defendant has merely acquired or kept the plaintiff's trade secrets. "[I]t is imperative for the movant seeking injunctive relief to demonstrate that there is a threat that the stolen trade secrets would be used in such a way that any harm could not be remedied through money damages." *ParTech, Inc. v. Jackson*, 2025 WL 343215, at *9 (S.D.N.Y. Jan. 29, 2025).

Plaintiffs have not shown that Defendants have disseminated any of Plaintiffs' confidential materials, or taken any other act that would impair the value of Plaintiffs' information. *See TomGal LLC v. Castano*, 2022 WL 17822717, at *4 (S.D.N.Y. Dec. 19, 2022) (denying injunctive relief because "[t]he plaintiffs have not alleged that their trade secrets have been disseminated by the defendants to 'a wider audience,' such that they no longer remain secret and are lost forever."); *see, e.g.*, *Amimon, Inc. v. Shenzhen Hollyland Tech Co.*, 2023 WL 2478159, at *6 (S.D.N.Y. Mar. 13, 2023) ("[T]he evidence suggests that Hollyland may have improperly used and altered [plaintiff's trade secrets] to profit from the technology. However, the evidence does not show, at this stage, that Defendants are disseminating those secrets . . . to a wider audience, or are otherwise irreparably damaging the code so as to render the harm cureless or irrecoverable." (citation omitted)). Nor have Plaintiffs shown that dissemination is inevitable. *Cf. Accenture LLP v. Trautman*, 2021 WL 6619331, at *10 (S.D.N.Y. June 8, 2021) (discussing how courts evaluate whether disclosure is inevitable). Even if Plaintiffs are right that Defendants intended to repurpose Plaintiffs' code for HedgeRow—a claim the factual record does not support—the resulting harm would be the loss of customers and could be pecuniarily resolved. *See Faiveley*, 559 F.3d at 119; *accord TomGal*, 2022 WL 17822717, at *4 (holding that "because the defendants have allegedly been using the plaintiffs' trade secrets for their own profit . . ., there is little danger that the

plaintiffs' trade secrets, whatever they may be, will be disseminated widely in such a way as to destroy their secrecy and cause the plaintiffs irreparable harm").

Second, even where a trade secret is not disseminated, its use may cause irreparable harm where it threatens the owners' good will, reputation, or business opportunities. *See IME Watchdog*, 732 F. Supp. 3d at 240. Where, for example, a competitor uses purloined trade secrets to interfere with the plaintiff's customer base, the damages may be so difficult to calculate as to make monetary redress infeasible. *See Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004); *see also Coastal Distribution, LLC v. Town of Babylon*, 216 F. App'x 97, 100 (2d Cir. 2007) (summary order) ("It was not clearly erroneous for the district court to find that Coastal's relationships with its customers could be permanently harmed by Coastal's inability to assure customers that its business will be ongoing."). However, Plaintiffs here have not shown that they are facing imminent threats to their good will, reputation, or business opportunities.

"Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as 'the expectancy of continued patronage,' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993); *see also Des Moines Gas Co. v. City of Des Moines*, 238 U.S. 153, 165 (1915) (defining "good will" as "that element of value which inheres in the fixed and favorable consideration of customers, arising from an established and well-known and well-conducted business"). Plaintiffs fail to show that Defendants are interfering with Plaintiffs' customer relationships in a manner that could threaten Plaintiffs' good will. Plaintiffs do not have customers and have not shown that it is likely that they will ever

have customers.  Defendants' mere solicitation of potential customers or investors for themselves does not suffice.  *See Bullion Shark LLC v. Flip A Coin LLC*, 2023 WL 8455669, at *4 (E.D.N.Y. Dec. 6, 2023) (denying injunctive relief where the evidence did "not suggest that Defendants' conduct has caused, or is causing, [individuals who purchased defendants' product] to lose their goodwill toward [plaintiff] or that they will not purchase from the company in the future").  If, hypothetically, Defendants used Plaintiffs' intellectual property to develop a business that Plaintiffs never could or would develop, the Court could require Defendants to compensate Plaintiffs for that use.  Injunctive relief would not be necessary.  Moreover, the Individual Defendants all testified that HedgeRow never progressed beyond a mere idea for the business; none of them wrote any code for it and none of them intend to pursue the business.  Tr. at 133:6–15, 154:16–17, 157:1–2, 158:4–6, 158:15–18, 181:13–14, 181:21–182:3.  Neither HedgeRow nor Plaintiffs have or ever had any customers.  HedgeRow therefore cannot interfere with Plaintiffs' good will.

With respect to Plaintiffs' reputation or business opportunities, Del Grande testified that investors who would have been impressed with the quality of his team were scared off by Defendants' sudden departure and the initiation of this lawsuit.  *Id*. at 78:8–16.  Those alleged harms have already transpired and there is no evidence they are ongoing such that they could be remedied through injunctive relief.  *See Lodging Sols., LLC v. Miller*, 2019 WL 13399129, at *4 (S.D.N.Y. Dec. 23, 2019) (Nathan, J.) (holding that plaintiff failed to show irreparable harm because "to the extent that [plaintiff's] reputation is damaged, that harm is more likely to be a product of [defendant's] departure from [plaintiff]—which has already occurred and will not change no matter the result in this litigation—rather than his move to [a competitor] specifically"). "[A] preliminary injunction here would be very much like locking the barn door after the horse is

gone." *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F.Supp.2d 277, 282 (S.D.N.Y. 1998); *see Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) ("The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred."); *T & L Redemption Ctr. Corp. v. Phoenix Beverages, Inc.*, 752 F. Supp. 64, 67 (E.D.N.Y. 1989) ("[F]or all practical purposes T & L is presently, and was at the time the instant application was filed, already out of business.  Since injunctive relief is intended to prevent future irreparable harm, where, as here, the harm to the moving party has already occurred, such relief is inappropriate."  (citation and punctuation omitted)); *Alpha Founders Holding, LLC v. Magellan Health, Inc.*, 2018 WL 1247405, at *5 (E.D.N.Y. Mar. 9, 2018) (collecting cases).[19]

Third, Plaintiffs point to Paragraph 10.8 of the SDAs which provide that "[e]ach party acknowledges and agrees that a breach or threatened breach by such party of any of its obligations under 9 would cause the other party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other party will be entitled to equitable relief, including a restraining order, an injunction, specific performance."  Pl. Ex. 2A § 10.8; Pl. Ex. 2B § 10.8; Pl. Ex. 2C § 10.8; Pl. Ex. 2D § 10.8.  As a threshold matter, it is not clear how the phrase "under 9" modifies the application of that provision. *See* Pl. Ex. 2A § 9 (setting forth obligations to indemnify); Pl. Ex. 2B § 9 (same); Pl. Ex. 2C § 9 (same); Pl. Ex. 2D § 9 (same).  Regardless, "contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive

---

[19] Given Plaintiffs' infancy, it is also unclear whether Plaintiffs had any established reputation in the industry.  Plaintiffs introduced no evidence of the reputation they possessed prior to Defendants' challenged conduct that has been, or could be, harmed on account of Defendants' acts. *See ExpertConnect, LLC v. Fowler*, 2020 WL 57518, at *3 (S.D.N.Y. Jan. 6, 2020) (holding there was no irreparable harm where plaintiffs failed to submit evidence of "reputational harm resulting from clients' and experts' loss of confidence in ExpertConnect's ability to protect its proprietary information").

relief is appropriate." *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987).  "Such language is instead 'merely one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue.'"  *Singas*, 2011 WL 497978, at *7 (quoting *Markovits v. Venture Info Cap., Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001)).  Given Plaintiffs' failure to show any other irreparable harm, the language in the SDAs does not suffice.

## CONCLUSION

Plaintiffs fail to demonstrate either a likelihood of success on the merits or a threat of irreparable harm.  Plaintiffs' motion for a preliminary injunction is accordingly DENIED.

Plaintiffs' motion to seal is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 41 and 51.

SO ORDERED.


Dated: July 8, 2025
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge